**Opinion issued May 3, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00210-CV

———————————

**FRANCISCO CALLEJA-AHEDO, Appellant**

**V.**

**COMPASS BANK, Appellee**

---

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Case No. 2014-22168**

---

## O P I N I O N

Francisco Calleja-Ahedo ("Calleja") sued Compass Bank ("the Bank") after it did not refund payment of an allegedly forged check and additional allegedly unauthorized transactions drawn on Calleja's account. Both parties moved for

summary judgment. The trial court granted the Bank's summary judgment motion, denied Calleja's motion, and awarded the Bank $49,186.65 in trial-level attorney's fees and $60,000 in conditional appellate attorney's fees. In eight issues, Calleja contends (1) the trial court erroneously granted the Bank's summary judgment motion because the Bank failed to prove that the deposit agreement it relied upon was effective as to Calleja; (2) the Bank failed to comply with the deposit agreement; (3) the Bank failed to produce competent summary judgment evidence that it sent or made available account statements to Calleja; (4) the Bank failed to act in good faith in connection with the transaction at issue; (5) the Bank presented no evidence that Calleja violated Business and Commerce Code sections 3.405 and 3.406; (6) the Bank's no evidence summary judgment motion was improper and premature; (7) the trial court erroneously denied Calleja's summary judgment motion because Calleja proved that an unauthorized payment was made from his account and the Bank failed to prove its affirmative defenses; and (8) the trial court erred in awarding attorney's fees to the Bank.

We reverse and render judgment.

## Background

Calleja opened a money market account with the Bank in 1988. Calleja, his wife, and his father were all listed as signatories on the account. Calleja lives in Mexico City, but he directed the Bank to send his monthly account statements to

2

his brother, who lives in The Woodlands. Calleja would visit his brother in The Woodlands from "time to time" and pick up the unopened account statements that his brother retained for him. Calleja never accessed his account statements on the Internet, and he never set up online banking. He acknowledged that he used this account infrequently.

The account statement for May 2012, which was mailed by the Bank in early June, is the last statement that Calleja received at his brother's address. In June 2012, an unknown person contacted the Bank, asked that the address on file for the account be changed to an address in California, obtained a debit card, and ordered a set of blank checks. Over the next several months, the Bank mailed account statements to addresses in California and then in Georgia. Calleja contends that none of the signatories on the account authorized these address changes. He did not contact the Bank and notify it that he was no longer receiving account statements at his brother's address.

On July 30, 2012, the Bank cashed a check in the amount of $38,700. In the ensuing months, as a result of several debit card purchases and service charge fees, the account balance dwindled and then became negative.

In January 2014, eighteen months after the Bank paid the $38,700 check, an acquaintance of Calleja's informed him that a check that Calleja had written drawn on the account had been returned with the notation "account closed." Calleja

3

traveled to The Woodlands to meet with Bank officials. He alleges that this meeting was the first time he learned that the account address had been changed and that the Bank had paid the $38,700 check. Calleja informed Bank officials that the check was a forgery and that all subsequent transactions were similarly unauthorized, and he completed a forgery affidavit, averring that the address listed as his on the forged check and the payee of that check were unknown to him. Calleja requested that the Bank credit his account in the amount of the unauthorized checks and withdrawals.

Shortly after Calleja reported the unauthorized withdrawals, a Bank official sent him a letter informing him that, pursuant to the deposit agreement, because Calleja did not report the alleged unauthorized withdrawals for eighteen months, the Bank was not liable to him and would not refund the amounts. In response, Calleja filed the underlying suit against the Bank, seeking a refund of the $38,700 paid on the check and the additional unauthorized charges, pre-judgment interest, costs, and attorney's fees. The Bank answered and asserted numerous affirmative defenses, including the application of Business and Commerce Code section 4.406, which precludes claims against banks when the plaintiff fails to discover and report allegedly unauthorized signatures in a timely manner. The Bank also filed a counterclaim seeking attorney's fees.

4

Calleja moved for summary judgment on his own claim. Calleja argued that because the Bank did not send account statements to the requested address after June 2012, the Bank did not "send or make available" account statements to him, the proper account holder, and, therefore, any duty that he had to discover and report unauthorized transactions never arose. As the relevant deposit agreement governing his relationship with the Bank, Calleja relied upon a version that became effective in 2008 ("the 2008 Agreement").

As summary judgment evidence, Calleja attached the 2008 Agreement, his affidavit detailing how he conducted his banking and how he learned of the unauthorized transactions, the signature card with the signatures of all three signatories and his Mexico City address, a copy of the $38,700 check, the forgery affidavit that he completed, an e-mail concerning this dispute that he sent to a Bank official, the letter that he received from the Bank denying liability, account statements for June 2012 through September 2013, all of which were addressed to addresses other than his brother's apartment in The Woodlands, and his counsel's attorney's fees affidavit.

The 2008 Agreement provided that the Bank would mail or deliver periodic account statements to Calleja on a monthly basis. Calleja agreed to give the Bank written notice if his address changed, and the 2008 Agreement provided that any account owner could change the address. The 2008 Agreement stated, "We may

make statements . . . available to you by holding all or any of these items for you, or delivering all or any of these items to you, in accordance with your request or instructions." The 2008 Agreement also contained the following provision concerning account errors:

> Our records regarding your accounts will be deemed correct unless you timely establish with us that we made an error. It is essential that any account errors . . . unauthorized transactions, alterations, unauthorized signatures, forgeries . . . or any other improper transactions on your account (collectively referred to as "exceptions") be reported to us as soon as reasonably possible. Otherwise, we may not be liable for the exceptions. You agree that you will carefully examine each account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us within thirty (30) days after we send the statement or notice to you, you agree that we will not be liable to you for any loss you suffer related to that exception. This means that, if you do not report exceptions to us within thirty (30) days after we send the statement or notice to you, we will not reimburse you for any loss you suffer, including, but not limited to, any amounts lost as a result of: paying any unauthorized, forged, or altered item . . . . Except as provided by applicable law, you also agree that we will not be required to reimburse you for any exceptions caused by your own negligence.

The 2008 Agreement also provided that the Bank could amend the agreement upon prior notice to Calleja. Specifically, the Bank agreed to provide prior notice of any amendments at least thirty days before the amendments became effective by "mailing you notice of the amendment to the last address shown on our records, by making the notice available with the periodic statement of your

6

account (as applicable), or by posting notice of the amendment in our offices." The 2008 Agreement further provided, "By continuing to maintain your account or obtaining services or products relating to this Agreement or your account after the amendment becomes effective, you agree to the amendment of this Agreement." The 2008 Agreement provided for the limited recovery of attorney's fees under circumstances not applicable to this case.

The Bank also moved for summary judgment. The Bank argued that Calleja should bear the loss in this case, as he had a duty to inspect his account statements for unauthorized charges, and, if he was not receiving account statements, he should have notified the Bank. The Bank attached one of Calleja's interrogatory answers, in which he stated that he "had no reason to review bank statements during this time period because the [a]ccount was virtually inactive." The Bank argued that, pursuant to Business and Commerce Code section 4.406(f), Calleja was precluded from asserting the allegedly unauthorized transactions against the Bank because he did not report the transactions to the Bank within one year, instead waiting eighteen months after the unauthorized transactions to report them to the Bank. The Bank also argued that Business and Commerce Code section 3.406 precluded Calleja's claim, as Calleja permitted his brother "to access [his] banking information [which] allowed other parties to learn [his] banking information," which likely led to the unauthorized transactions. The Bank argued

7

that it was entitled to attorney's fees under the deposit agreement, and it presented the affidavit of its counsel in support of its request.

As summary judgment evidence, the Bank presented a different version of the deposit agreement with Calleja, one that had allegedly been amended in February 2012 ("the 2012 Agreement"). The Bank accompanied this agreement with the affidavit of Kathy Mueller, a Bank employee, who averred that the attached 2012 Agreement was "a copy of the written contract governing the deposit relationship between [Calleja] and Compass Bank" and that "the account agreement evidences the agreement in effect between [Calleja] and Compass Bank." The 2012 Agreement was substantially similar to the 2008 Agreement, but it did contain several changes relevant to this dispute. The 2012 Agreement explicitly stated, "Notify us promptly if you do not receive your statement by the date you normally would expect to receive it." The 2012 Agreement also contained slightly different language concerning the reporting of errors in account statements:

> You agree that you will carefully examine each account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us within thirty (30) days after we send *or make the statement or notice available to you*, you agree that we will not be liable to you for any loss you suffer related to that exception and that you cannot later dispute the transaction amounts and the information contained in the statement.

8

(Emphasis added.) The 2012 Agreement also provided for attorney's fees, stating, "In any action between you and us, the prevailing party shall be entitled to recover its reasonable attorney's fees expended in the prosecution or defense of the court action from the other party." The final page of the 2012 Agreement contained the following notation: "Revision Feb 2012 Al Nova Branches Only." The Bank presented no summary judgment evidence explaining the meaning of the "Al Nova Branches Only" notation and whether that applied to Calleja, nor did it present any evidence concerning how it gave notice of the amended agreement to Calleja.

In response to Calleja's summary judgment motion, the Bank attached a second affidavit by Mueller to address arguments that Calleja raised, including which version of the deposit agreement was applicable and actions Calleja could have taken if he had not received his account statements. Mueller averred:

> In my first Affidavit, I attached what I believed to be the proper deposit agreement governing the parties' relationship. The deposit agreement attached had a revision date of February 2012. Plaintiff claims that an imposter allegedly impersonated Plaintiff and changed the address on the account during the summer of 2012 so it appears that the February 2012 version was the version in effect at that time. Consequently, I believe that the deposit agreement that I attached to my Affidavit was the proper deposit agreement governing the relationship. Because Plaintiff had signed the signature card agreeing to be bound by the deposit agreement, and agreeing that it could be amended from time to time, I believe that deposit agreement governed the parties' relationship. Plus, Plaintiff could have closed his account if he did not want to be bound by the deposit agreement. For all of these reasons and many more reasons, I believe that the deposit

agreement I attached to my first affidavit governed the parties' relationship.

Mueller also averred that if Calleja had not received his monthly account statements, as he expected to, he could have notified the Bank, obtained copies at any branch, or reviewed the statements online.

The trial court issued separate orders granting the Bank's summary judgment motion and denying Calleja's motion. In the order granting the Bank's motion, the trial court stated:

> In particular, but not as the sole reason for this ruling, the Court noted that where the check at issue was cashed on July 30, 2012, and the Plaintiff did not notify the bank until January 29, 2014, as a matter of law Plaintiff has failed to exercise diligence in protecting himself from alleged fraud regardless of any shortcomings in sending bank statements. Plaintiff's focus on the word "sends" as used in section 4-406 of the Texas Business and Commerce Code is too exclusive and ignores the equally important and relevant "or makes available" language of that section. Further, duties found in the deposit agreement attached to Compass Bank's Motion for Summary Judgment which include a requirement that the depositor "act in a prompt and reasonable manner" relating to his account statements are also important and weigh against Plaintiff's position. There are no material issues of fact which preclude granting this motion.

The trial court also awarded the Bank $49,186.65 in trial-level attorney's fees and a total of $60,000 in conditional appellate attorney's fees. This appeal followed.

## Summary Judgment

In six of his eight issues, Calleja contends that the trial court erred in granting the Bank's summary judgment motion. Specifically, Calleja contends that

10

the Bank failed to prove that the 2012 Agreement applied to his account; the Bank failed to comply with the 2008 Agreement; the Bank failed to produce competent evidence that it sent or made available the account statements to Calleja; the Bank failed to act in good faith in connection with the transaction; there is no evidence that Calleja violated Business and Commerce Code sections 3.405 and 3.46; and the Bank's no evidence summary judgment motion was improper and premature. In his eighth issue, Calleja contends that the trial court erred in denying his own summary judgment motion because he proved that an unauthorized payment had been made from his account and the Bank failed to prove its affirmative defenses.

### A. Standard of Review

When both parties move for summary judgment and the trial court grants one motion and denies the other, we review both parties' summary judgment evidence and determine all questions presented. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). Each party bears the burden of establishing that he is entitled to judgment as a matter of law. *City of Santa Fe v. Boudreaux*, 256 S.W.3d 819, 822 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also* TEX. R. CIV. P. 166a(c) ("The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or

any other response."). If we determine that the trial court erred, we render the judgment that the trial court should have rendered. *Dorsett*, 164 S.W.3d at 661; *FM Props.,* 22 S.W.3d at 872. If the trial court's order does not specify the grounds for its summary judgment ruling, we affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

### B. The Governing Account Agreement Under Finance Code Sections 34.301 and 34.302

As a threshold issue, we must determine which version of the deposit agreement governed the parties' relationship. Both parties agree that the 2008 Agreement was, at least at one point, effective as to Calleja. Calleja contends that this agreement was in effect at the time the forgeries occurred in June and July 2012, but the Bank contends that the deposit agreement had been amended in February 2012, as permitted by the 2008 Agreement, and that the 2012 Agreement governed the parties' relationship.

The Texas Finance Code provides that a deposit contract between a bank and an account holder "is considered a contract in writing for all purposes and may be evidenced by one or more agreements, deposit tickets, signature cards, or notices as provided by [Finance Code] Section 34.302, or by other documentation as provided by law." TEX. FIN. CODE ANN. § 34.301(a) (Vernon 2013). Section

34.302(a) provides that a bank and an account holder may amend the deposit contract "by agreement or as permitted by Subsection (b) or other law." *Id.* § 34.302(a) (Vernon 2013). Section 34.302(b) allows a bank to amend a deposit contract by mailing a written notice of the amendment, including the text of the amendment and the effective date, to the account holder. *Id.* § 34.302(b).

Section 17 of the 2008 Agreement addresses amendments to the deposit agreement. It provides, in relevant part:

> We may amend this Agreement from time to time upon giving prior notice to you. Amendments of this Agreement may include modifying and deleting existing provisions and adding new provisions. We agree to provide you notice of any amendment (except an amendment benefitting you) at least thirty (30) days, or a longer period if required by law, before that amendment becomes effective by mailing you notice of the amendment to the last address shown on our records, by making the notice available with the periodic statement of your account (as applicable), or by posting notice of the amendment in our offices. We may, but are not required to, give you notice if the amendment will be to your benefit. If there is more than one account owner, we will send the notice of amendment to only one of you. By continuing to maintain your account or obtaining services or products relating to this Agreement or your account after the amendment becomes effective, you agree to the amendment of this Agreement.

The Bank argues that it amended the deposit agreement in February 2012 and that, because Calleja indisputably maintained the account after this date, he agreed to the February 2012 amendments, and thus the 2012 Agreement controls. As summary judgment evidence, the Bank attached an affidavit completed by Kathy Mueller, an employee of the Bank, and the 2012 Agreement, which was

13

incorporated into the affidavit by reference.  Mueller averred that the 2012 Agreement governed Calleja's account, stating, "[Calleja] agreed to be bound by a deposit agreement governing his account at Compass Bank.  Attached as Tab 1 is a copy of the written contract [the 2012 Agreement] governing the deposit relationship between [Calleja] and Compass Bank]" and "the [attached] account agreement evidences the agreement in effect between [Calleja] and Compass Bank."  The last page of the 2012 Agreement states, "Revision Feb 2012 Al Nova Branches Only."  The Bank presented no evidence, either from Mueller or another Bank employee, concerning what "Al Nova Branches Only" meant, whether this applied to Calleja, or whether notice of the 2012 Agreement was mailed to Calleja, provided with his account statement, or posted in the Bank's offices.

Based on this record, we conclude that the Bank has not established that the 2012 Agreement was ever effective as to Calleja.  Although both the Finance Code and the 2008 Agreement allow the Bank to amend the deposit agreement, the Bank has not established that it did so in a manner allowed by either the Finance Code or the 2008 Agreement.  The Bank presented no summary judgment evidence that it mailed notice of the proposed amendments to Calleja, that it included the proposed amendments with his account statement, or that it posted notice of the amendments in its offices.  *See* TEX. FIN. CODE ANN. § 34.302(b) (stating ways in which bank may notify account holder of amendments to deposit agreement).  Instead, the

14

Bank merely attached the 2012 Agreement as summary judgment evidence and provided conclusory affidavit testimony from one of its employees that the 2012 Agreement governed Calleja's account. *See Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 133 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("An affiant's belief about the facts is legally insufficient evidence. Likewise, conclusory affidavits do not raise fact issues because '[t]hey are not credible, nor susceptible to being readily controverted.' 'A conclusory statement is one that does not provide the underlying facts to support the conclusion.'") (quoting *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996), and *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no writ)).

We conclude that the evidence is not sufficient to establish that the 2012 Agreement governed the Bank's relationship with Calleja, and the trial court therefore erred in considering the 2012 Agreement to be the controlling deposit agreement.

### C. Whether the Trial Court Properly Granted the Bank's Motion

Article 4 of the Uniform Commercial Code ("UCC"), found in Texas Business and Commerce Code Chapter 4, establishes the rights and duties between banks and their customers regarding deposits and collections. *Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000); *see* TEX. BUS. & COM. CODE ANN. §§ 4.101–.504 (Vernon 2002 & Supp. 2015). Under this statutory

15

scheme, a bank is liable to its customer if it charges the customer's account for an item that is not properly payable from that account, such as items with an unauthorized signature. *Martin*, 29 S.W.3d at 91; *see* TEX. BUS. & COM. CODE ANN. § 4.401(a) (Vernon 2002) ("A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank.").

### 1. Duty to Discover and Report Unauthorized Signatures Under UCC Section 4.406

Section 4.406 addresses a customer's duty to discover and report unauthorized signatures. *See Schiro v. Tex. Cmty. Bank, N.A.*, 68 S.W.3d 55, 57 (Tex. App.—Dallas 2001, no pet.) ("Bank customers have a duty to discover and report unauthorized signatures on their accounts."). Section 4.406(a) requires a bank that sends or makes available account statements to the customer to "either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid." TEX. BUS. & COM. CODE ANN. § 4.406(a) (Vernon 2002). The Uniform Commercial Code defines "sends" as "to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of

16

transmission provided for and properly addressed." *Id.* § 1.201(b)(36)(A) (Vernon Supp. 2015).

The Code does not define "makes available." If a bank sends or makes available account statements, "the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized . . . because a purported signature by or on behalf of the customer was not authorized." *Id.* § 4.406(c). If, based on the account statement provided, the customer reasonably should have discovered the unauthorized payment, "the customer must promptly notify the bank of the relevant facts." *Id.*

Section 4.406 also provides a defense to banks in certain circumstances:

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer . . . discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

*Id.* § 4.406(f); *Martin*, 29 S.W.3d at 91 (stating that customer is "absolutely precluded" from asserting his unauthorized signature if customer fails to discover and report unauthorized signature within one year after bank makes available account statement showing allegedly unauthorized transaction). Parties are allowed to vary the effect of Article 4's provisions by agreement, including shortening the time period that a customer has to discover and report an unauthorized transaction. *See Martin*, 29 S.W.3d at 95–96; *see also* TEX. BUS. &

17

COM. CODE ANN. § 4.103(a) (Vernon 2002) ("The effect of the provisions of this chapter may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure."); *Canfield v. Bank One, Tex., N.A.*, 51 S.W.3d 828, 836 (Tex. App.—Texarkana 2001, pet. denied) ("Deposit agreements, which may shorten the statutory time limits on the notice required to be given by a customer, are enforceable as a contract between the parties.").

In *Martin*, the Texas Supreme Court noted that one of the purposes of the UCC is to "facilitate[] financial transactions, benefitting both consumers and financial institutions, by allocating responsibility among the parties according to whoever is best able to prevent a loss." 29 S.W.3d at 92. The court reasoned:

> Because the customer is more familiar with his own signature, and should know whether or not he authorized a particular withdrawal or check, he can prevent further unauthorized activity better than a financial institution, which may process thousands of transactions in a single day. Section 4.406 acknowledges that the customer is best situated to detect unauthorized transactions on his own account by placing the burden on the customer to exercise reasonable care to discover and report such transactions. The customer's duty to exercise this care is triggered when the bank satisfies its burden to provide sufficient information to the customer. As a result, if the bank provides sufficient information, the customer bears the loss when he fails to detect and notify the bank about unauthorized transactions.

*Id.* The court further stated that the burden on the customer includes "the risk of nonreceipt of account statements" and that the customer's duty to detect and report

18

unauthorized actions "is triggered when the bank meets its burden to provide the customer with enough information that the customer can detect that the unauthorized transaction has occurred." *Id.* at 94; *see also Jefferson State Bank v. Lenk*, 323 S.W.3d 146, 149 (Tex. 2010) (stating that bank has initial burden to "send or make available the [account] statement to its customer"). The bank does not satisfy this burden by sending account statements to an imposter. *See Lenk*, 323 S.W.3d at 149 (rejecting argument that defendant bank complied with section 4.406 by sending account statements to imposter estate administrator, noting that imposter was not bank's customer, and thus "sending [the imposter] the statements could not fulfill the Bank's obligation to provide account statements 'to a customer'").

### 2. Whether Section 4.406 Precludes Calleja from Asserting Unauthorized Signature

#### a. Whether statements were "sent or made available" to Calleja

The Bank contends that section 4.406(f) precludes Calleja from asserting the imposter's unauthorized signature and seeking a refund of the amounts removed from his account because it "sent or made available" account statements to Calleja, but he did not notify the Bank of the forgery within one year, as the statute requires. Specifically, the Bank argues that it mailed account statements to the address that it had in its files and that it made the account statements available because the statements could be accessed at a branch office or online. Calleja

19

contends that the Bank did not send or make available the account statements within the meaning of the statute because section 4.406 requires the sending of account statements to the account holder, not to an imposter, and the 2008 Agreement contractually limits how the Bank may make statements available. We agree with Calleja.

The summary judgment evidence reflects that, through May 2012, Calleja received account statements at his brother's address in The Woodlands in accordance with his instructions to the Bank. In June 2012, an unknown person falsely represented to Bank employees that he was Calleja, and, as a result of this deception, the unknown person was able to change the address on the account for the mailing of statements, to obtain a debit card, and to order blank checks. Bank statements reflect that the statement for June 2012, which was mailed in early July 2012 and which reflected the payment for a new set of blank checks, was mailed to an address in Cupertino, California, instead of to Calleja's brother's address in The Woodlands. The Bank cashed a check for $38,700 drawn on Calleja's account on July 30, 2012, and this withdrawal was reflected on the account statement for July 2012, which was mailed to an address in Sacramento, California in early August 2012. Subsequent account statements, which reflected additional withdrawals and service charges, were mailed to the Sacramento address and then to a series of addresses in Georgia. Calleja averred that neither he nor the other two authorized

signatories on the account ever initiated these address changes and that none of them authorized the payments made from the account beginning in June 2012.

In *Martin*, the Texas Supreme Court recognized that the bank customer "is best situated to detect unauthorized transactions on his own account by placing the burden on the customer to exercise reasonable care to discover and report such transactions." 29 S.W.3d at 92. However, the court then stated,

> The customer's duty to exercise this care is triggered when the bank satisfies its burden to provide sufficient information to the customer. As a result, if the bank provides sufficient information, the customer bears the loss when he fails to detect and notify the bank about unauthorized transactions.

*Id.*; *Compass Bank v. Nacim*, 459 S.W.3d 95, 107 (Tex. App.—El Paso 2015, no pet.) ("Under Section 4.406(a), the bank triggers the customer's duty to inspect and report questionable items when it 'makes available' a sufficient account statement."). "This duty to detect and report is triggered when the bank meets its burden to provide the customer with enough information that the customer can detect that the unauthorized transaction has occurred." *Martin*, 29 S.W.3d at 94. The Texas Supreme Court later clarified that a bank does not satisfy this burden when it provides account statements to an imposter. *Lenk*, 323 S.W.3d at 149 (holding that bank did not provide account statements to customer when it provided statements to imposter who had represented to bank that he was estate representative of deceased customer). An imposter does not become the bank's

customer, and section 4.406 requires a bank that chooses to send or make available account statements to a customer to send the statements to its *customer*. *See id.*; *see also* TEX. BUS. & COM. CODE ANN. § 4.406(a) ("A bank that sends or makes available *to a customer* a statement of account showing payment of items for the account shall either return or make available *to the customer* the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid.") (emphasis added).

Here, by allowing an unknown and unauthorized third party to change the address on the account in June 2012 and then by mailing subsequent account statements to the unknown party, instead of to Calleja at his brother's address in The Woodlands, the Bank did not "send" account statements to its customer. *See* TEX. BUS. & COM. CODE ANN. § 4.406(a); *Lenk*, 323 S.W.3d at 149; *Martin*, 29 S.W.3d at 92, 94. We therefore must consider whether the Bank "made available" the account statements to Calleja. *See* TEX. BUS. & COM. CODE ANN. § 4.406(c) ("If a bank sends *or makes available* a statement of account or items pursuant to Subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized . . . because a purported signature by or on behalf of the customer was not authorized.") (emphasis added).

The Bank argues that it did make account statements available to Calleja because, at all relevant times, Calleja could have visited any branch of the Bank to request copies of his statements, he could have set up online banking and accessed his statements via the Internet, or he could have called the Bank and reported that he had not received his statements and gain access in that manner. Calleja, however, points out that, although the UCC does not define "make available," the 2008 Agreement does. Specifically, the 2008 Agreement provides, "We may make statements, canceled checks (if applicable to your account), notices or other communications available to you by holding all or any of these items for you, or delivering all or any of these items to you, in accordance with your request or instructions."[1] Calleja averred that he requested that the Bank provide account statements to him at his brother's address and that he never requested that the Bank change the authorized address or retain account statements for him at the Bank.

In the 2008 Agreement, the parties thus agreed to a specific definition of "make available," namely, that the Bank might make account statements available to Calleja "by holding all or any of these items for you, or delivering all or any of these items to you, in accordance with your request or instructions." Calleja

---

[1] The 2012 Agreement contains an identical provision. That agreement then states, "If we hold statements or notices to you *at your request or because you fail to provide us with a current address*, they will be deemed delivered to you when they are prepared (for held statements), mailed (for returned mail) or otherwise made available to you." (Emphasis added.)

23

presented summary judgment evidence that he instructed the Bank to provide account statements to him by delivering the statements to his brother's address in The Woodlands and that he never instructed the Bank to hold statements for him at a branch office. The Bank presented no contradictory evidence. Thus, the parties contractually limited the ways in which the Bank could make account statements available to Calleja, and both parties are bound by this limitation. *See Nacim*, 459 S.W.3d at 108 ("If we are to engage in the fiction that customers actually read and agree to the modified terms and conditions of their account agreements, and enforce those provisions which favor the bank, then we must also apply those which work to the bank's detriment."). Because the summary judgment evidence reflects that the Bank, at the behest of an unknown third party, changed the address on the account and mailed account statements, beginning with the June 2012 statement that first reflected an unauthorized transaction, to a series of addresses unauthorized by Calleja and did not mail account statements to the authorized address in The Woodlands, we hold that the Bank did not "make available" the account statements in accordance with the governing 2008 Agreement.

### b. Whether Calleja's "duty to report" was triggered

We likewise hold that Calleja's duty to report unauthorized transactions never arose under the 2008 Agreement. The 2008 Agreement provides:

> You agree that you will carefully examine each account statement or notice *you receive* and report any exceptions to us promptly *after you*

24

*receive the statement* or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us *within thirty (30) days after we send the statement or notice to you*, you agree that we will not be liable to you for any loss you suffer related to that exception. This means that, if you do not report exceptions to us within thirty (30) days after we send the statement or notice to you, we will not reimburse you for any loss you suffer, including, but not limited to, any amounts lost as a result of: paying any unauthorized, forged, or altered item . . . .

(Emphasis added.) As we have noted, the summary judgment evidence reflects that the Bank did not send the account statements that reflected the unauthorized transactions to Calleja. Thus, Calleja's contractual duty under the deposit agreement to report unauthorized transactions also never arose.[2] We hold that the trial court erred in determining that Calleja did not satisfy either his statutory duties or his contractual duties to report unauthorized transactions.

We sustain Calleja's first, second, and third issues.

### 3. *The Bank's Affirmative Defenses Under UCC Sections 3.405 and 3.406*

As an additional basis for summary judgment, the Bank also argued that Calleja was precluded from recovery pursuant to the affirmative defenses found in

---

[2]    As the Bank points out, the 2012 Agreement states, "Notify us promptly if you do not receive your statement by the date you normally would expect to receive it." This provision is not included in the 2008 Agreement. Furthermore, the parties have identified no statutory duty on the part of the customer to notify the bank if he is not receiving account statements.

25

Business and Commerce Code sections 3.405 and 3.406 because Calleja entrusted his banking information to his brother, which likely led to his damages.

### a. Whether Calleja was responsible for fraudulent indorsements by an "employee"

The Bank argued that Business and Commerce Code section 3.405, entitled "Employer's Responsibility for Fraudulent Indorsement by Employee," applied to preclude Calleja's recovery. Specifically, the Bank argued that Calleja's brother, whom Calleja appointed to receive his account statements, was Calleja's "employee" and had responsibility over the account. Section 3.405 provides,

> For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person.

TEX. BUS. & COM. CODE ANN. § 3.405(b) (Vernon 2002). Section 3.405(a)(3) specifically defines "responsibility with respect to instruments" as

> authority (i) to sign or indorse instruments on behalf of the employer, (ii) to process instruments received by the employer for bookkeeping purposes, for deposit to an account, or for other disposition, (iii) to prepare or process instruments for issue in the name of the employer, (iv) to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer, (v) to control the disposition of instruments to be issued in the name of the employer, or (vi) to act otherwise with respect to instruments in a responsible capacity.

*Id.* § 3.405(a)(3); *see also Duong v. Bank One, N.A.*, 169 S.W.3d 246, 250 (Tex. App.—Fort Worth 2005, no pet.) ("Section 3.405 adopts a system of comparative negligence between an employer who grants an employee responsibility with respect to an instrument and a bank. The initial risk of loss in this situation is on the employer 'based on the belief that the employer is in a far better position to avoid the loss by care in choosing employees, in supervising them, and in adopting other measures to prevent forged indorsements on instruments payable to the employer or fraud in the issuance of instruments in the name of the employer.").

In addition to providing no evidence that Calleja's brother was Calleja's "employee," the Bank also provided no evidence that Calleja's brother had any "responsibility with respect to instruments." Instead, the only summary judgment evidence concerning Calleja's brother relates to account statements being sent to his address in The Woodlands, which he would hold unopened until Calleja traveled to the Houston area to collect the statements. There is no evidence in the record that Calleja's brother ever had any contact with, let alone any responsibility over, any instruments relating to Calleja's account. Furthermore, although the Bank suggests that Calleja's brother was involved with the unauthorized transactions at issue in this case, this argument is entirely speculative. The Bank has presented no competent summary judgment evidence demonstrating that Calleja's brother was the individual who pretended to be Calleja, changed the

address on the account, obtained a debit card, ordered blank checks, and wrote unauthorized checks and made unauthorized debit withdrawals from Calleja's account. We conclude that the Bank failed to establish that section 3.405 applies in this case, and, thus, it cannot be the basis for the trial court's summary judgment ruling.

### b. Whether Calleja failed to exercise "ordinary care"

Finally, Business and Commerce Code section 3.406 provides:

> A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

TEX. BUS. & COM. CODE ANN. § 3.406(a) (Vernon 2002). "Section 3.406 precludes the depositor from asserting wrongful payment against the bank if the depositor's negligence substantially contributed *to the alteration or forgery of the check* as long as the bank paid the instrument in good faith and in accordance with the reasonable commercial standards of the payor's business." *McDowell v. Dallas Teachers Credit Union*, 772 S.W.2d 183, 192 (Tex. App.—Dallas 1989, no writ) (emphasis added); *see also Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 680 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (stating that court had to determine "whether the Bank proved that VR failed to exercise ordinary care that substantially contributed to the alteration of the check").

28

The key inquiry under section 3.406 is whether an account holder's negligence "substantially contributes to an alteration of an instrument or to the making of a forged signature." *See* TEX. BUS. & COM. CODE ANN. § 3.406(a). In this case, the Bank points to no operative statutory or contractual provision that required Calleja to notice that he was not receiving statements at his brother's address and to report those missing statements to the Bank within thirty days. Rather, we have held that the evidence is legally insufficient to establish that the Bank sent Calleja's bank statements to him or made them available to him, as required by section 4.406 and the 2008 Agreement to trigger Calleja's duty to report unauthorized transactions to the Bank. Accordingly, Calleja could not be negligent for failing to report the unauthorized transactions.

Moreover, there is scant summary judgment evidence concerning the circumstances under which the unknown third party obtained Calleja's banking information and used that information to change the account address, obtain a debit card, order blank checks, and forge Calleja's signature on several checks. Calleja averred that he has not been able to determine who this third party was or how this person gained access to his banking information. In response to discovery requests, the Bank provided Calleja with audio recordings of conversations between Bank employees and a person purporting to be Calleja, but Calleja did not recognize that person's voice. Although the Bank speculates that Calleja's brother

was involved with the unauthorized transactions, the Bank can point to no evidence in the record supporting this contention. This case thus is not similar to either *VR Electric*, in which the evidence demonstrated that a VR Electric employee improperly indorsed the check at issue to himself, or *McDowell*, in which McDowell's bookkeeper forged her signature on over fifty share drafts. *See VR Elec.*, 276 S.W.3d at 675; *McDowell*, 772 S.W.2d at 186. Instead, the record contains no evidence concerning the identity of the imposter who forged Calleja's signature or how this individual gained access to Calleja's account.

The Bank argues that "[t]he trial court correctly concluded that, as a matter of law, [Calleja] failed to exercise ordinary care" and cites to the trial court's final judgment for support. This statement by the trial court, however, must be read in context of the final judgment itself. The trial court stated: "In particular, but not as the sole reason for this ruling, the Court noted [in a previous summary judgment order] that where the check at issue was cashed on July 30, 2012, and [Calleja] did not notify the bank until January 29, 2014, as a matter of law [Calleja] has failed to exercise diligence in protecting himself from alleged fraud regardless of any shortcomings in sending bank statements." This statement thus refers to Calleja's lack of diligence post-forgery in not discovering and reporting the unauthorized transactions; it cannot be read as a blanket statement that Calleja did not exercise

ordinary care and that this failure substantially contributed to the making of the forgery.

We conclude that the summary judgment record contains no evidence that Calleja failed to exercise ordinary care that substantially contributed to the making of the forged checks at issue. *See* TEX. BUS. & COM. CODE ANN. 3.406(a). Because the Bank did not conclusively establish this affirmative defense, we hold that, to the extent the trial court based its summary judgment ruling on this defense, the trial court erred. *See Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 704 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (stating that when defendant moves for traditional summary judgment, it must either disprove at least one essential element of plaintiff's claim or plead and conclusively establish each essential element of affirmative defense). Because we hold that the Bank is not entitled to summary judgment on the basis of Business and Commerce Code sections 3.405, 3.406, or 4.406, we hold that the trial court erred in granting summary judgment in favor of the Bank.

We sustain Calleja's sixth issue.[3]

---

[3] Because we hold that the trial court erred in rendering summary judgment in favor of the Bank, we vacate the attorney's fees award in favor of the Bank. Furthermore, because we hold that the trial court could not grant summary judgment on the basis of sections 3.405, 3.406, or 4.406, we need not address Calleja's fourth and seventh issues, that the trial court erred in granting summary judgment because he presented evidence that the Bank did not act in good faith

31

### D. *Whether the Trial Court Properly Denied Calleja's Motion*

In his eighth issue, Calleja contends that the trial court erred in denying his summary judgment motion on his claim because he established that the unauthorized payments were made from his account and the Bank failed to prove its affirmative defenses.

A bank may charge against its customer's account an item that is properly payable from that account, and an item is properly payable "if it is authorized by the customer and is in accordance with any agreement between the customer and the bank." TEX. BUS. & COM. CODE ANN. § 4.401(a). Calleja presented summary judgment evidence that neither he nor any other signatory on the account authorized the forged checks and subsequent withdrawals from the account beginning in June 2012. The Bank has not presented any contradictory evidence indicating that the challenged payments and withdrawals were actually authorized by an account holder. Furthermore, as we have already held, the Bank cannot take advantage of the affirmative defenses of sections 3.405, 3.406, or 4.406. We therefore conclude that Calleja established that he was entitled to summary judgment in his favor, and we hold that the trial court erred in denying his summary judgment motion.

---

and that the Bank's "no evidence" summary judgment motion was improper and premature, respectively. *See* TEX. R. APP. 47.1.

We sustain Calleja's eighth issue.[4]

## Conclusion

We reverse the trial court's summary judgment granting the Bank's motion and denying Calleja's motion, and we render judgment that Calleja is entitled to a refund from the Bank in the amount of the unauthorized withdrawals from his account. We vacate the attorney's fees award in favor of the Bank.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

---

[4] The 2008 Agreement, which we have held governed Calleja's and the Bank's relationship at the time of the unauthorized charges against Calleja's account, allows for the recovery of attorney's fees under limited circumstances not applicable here. This agreement, therefore, does not authorize Calleja's recovery of attorney's fees from the Bank.