# IN THE SUPREME COURT OF TEXAS

No. 17-0065

COMPASS BANK, PETITIONER,

v.

FRANCISCO CALLEJA-AHEDO, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

**Argued September 12, 2018**

JUSTICE BLACKLOCK delivered the opinion of the Court.

An identity thief drained Francisco Calleja-Ahedo's bank account through a series of fraudulent transactions in 2012 and 2013. Calleja sued his bank to recover the stolen funds. The question now is whether Calleja or his bank must suffer the financial consequences of the theft. Section 4.406 of the Business and Commerce Code contains the Texas legislature's answer to that question. "If a bank sends or makes available a statement of account . . . the customer must exercise reasonable promptness in examining the statement . . . to determine whether any payment was not authorized" and "must promptly notify the bank of the relevant facts" regarding the unauthorized payment. TEX. BUS. & COM. CODE § 4.406(c). Section 4.406 limits the liability of the bank when the customer fails to comply with these duties. *Id.* § 4.406(d).

Rather than monitor his account as contemplated by section 4.406, Calleja failed for over a year to look for missing bank statements or inquire about the status of his account. During this long period of inattention, the imposter completely drained the account. Though Calleja's loss is regrettable, section 4.406 prohibits him from recovering the lost funds from his bank. Although Calleja's bank statements were mailed to the imposter's address, the statements were available to Calleja through various other channels. Calleja failed to explore any of these channels or show any interest in keeping up with his account. If he had, his bank statements were readily available to him, and he could have identified and stopped the fraud. Under these circumstances, section 4.406 precludes Calleja's attempt to hold his bank liable for the losses. The deposit agreements between Calleja and his bank do not alter this outcome. Because the court of appeals concluded otherwise, we reverse its judgment.

## I. Factual and Procedural Background

Francisco Calleja-Ahedo opened an account with Compass Bank ("the Bank") in 1988. He lives in Mexico. The parties dispute the extent to which various deposit agreements govern the account. The 1988 signature card for the account directed the Bank to "Hold All Correspondence." Calleja[1] claims that the Bank's 2008 deposit agreement applied to his account. The Bank claims that a 2012 deposit agreement applied.

Although the signature card directed the Bank to hold all correspondence, Calleja testified that he told the Bank to send statements to his brother at an address in The Woodlands, Texas. The Bank sent statements to this address from 2008 until June 2012. Statements covering a given month were mailed at the beginning of the following month. Calleja's brother

---

[1] Because Calleja-Ahedo's brief refers to the Respondent as Calleja, this opinion will do the same.

did not open the statements. Calleja would from time to time review the statements when he visited his brother. The statements indicate that the account had a balance of $42,688.94 at the end of May 2012. Calleja's brother received the statement recording May 2012 account activity in early June. This statement turned out to be the last statement sent to the address in The Woodlands. Neither Calleja nor his brother nor two other signatories on the account (Calleja's wife and father) complained to the Bank that statements no longer arrived in The Woodlands.

In June 2012, an unknown person identified himself as Calleja and instructed the Bank to change the address on file to a California address and later to another California address and then to two Georgia addresses. In June 2012, the imposter ordered checks, for which the account was debited $33.23. This charge appears on the June statement, mailed in early July to California. A forged check for $38,700 (roughly 90% of the account balance) was paid from the account in July 2012. The imposter thereafter drained the account through a series of smaller transactions. By February 2013, the account had a negative balance. Calleja claims that he first learned of the change of address and fraudulent activity in January 2014, when an acquaintance told him a check from Calleja had been returned marked "account closed." Calleja called and visited the Bank at that time. He signed an affidavit disputing the unauthorized charges.

Calleja sued the Bank when it refused to pay for the unauthorized withdrawals. The parties filed cross-motions for summary judgment. An affidavit from a Bank employee stated that Calleja never complained about his brother's non-receipt of statements, that Calleja could have picked up copies of his statements at any branch office, that he could have ordered the statements online or reviewed them online, and that all the statements have a 1-800 number that Calleja could have called to get copies of missing statements or to set up online banking for free.

Calleja never signed up for online banking. After June 2012, Calleja did not receive statements at his brother's address. He did not notify the Bank of any concerns until eighteen months later, in late January 2014.

The trial court granted summary judgment for the Bank. Helpfully, the trial court provided an explanation for its ruling. It concluded that Calleja's claims were barred by section 4-406 of the Uniform Commercial Code, which the Texas legislature has codified as section 4.406 of the Business and Commerce Code. The trial court reasoned that account statements were "made available" to Calleja under section 4.406 and that Calleja waited too long to notify the Bank of the fraudulent activity. The trial court stated:

> [W]here the check at issue was cashed on July 30, 2012, and the Plaintiff did not notify the bank until January 29, 2014, as a matter of law Plaintiff has failed to exercise diligence in protecting himself from alleged fraud regardless of any shortcomings in sending bank statements. Plaintiff's focus on the word "sends" as used in section 4-406 of the Texas Business and Commerce Code is too exclusive and ignores the equally important and relevant "or makes available" language of that section. Further, duties found in the deposit agreement attached to Compass Bank's Motion for Summary Judgment which include a requirement that the depositor "act in a prompt and reasonable manner" relating to his account statements are also important and weigh against Plaintiff's position.

The court of appeals reversed and rendered judgment for Calleja. 508 S.W.3d 791 (Tex. App.—Houston [1st Dist.] 2016). The court of appeals acknowledged section 4.406's limitation on bank liability when banks send statements or make them available to their customers. Citing *Jefferson State Bank v. Lenk*, 323 S.W.3d 146 (Tex. 2010) (*Lenk I*), the court of appeals held that sending statements to the imposter did not amount to sending the statements to Calleja for purposes of section 4.406. As for whether the Bank made the statements available to Calleja, the court of appeals recognized that parties may, by agreement, alter the requirements of section 4.406. The court concluded that, as between the 2008 deposit agreement and the 2012

4

agreement, the 2008 agreement proffered by Calleja governs the account. The court interpreted a provision of the 2008 deposit agreement as a contractual modification of section 4.406. Based on this provision, the court held that the only way the Bank could make the statements available to Calleja and thereby trigger section 4.406 was to comply with his request to send the statements to his brother in The Woodlands. The court of appeals rejected the Bank's argument that it made the statements available to Calleja by holding them at its offices, offering free online banking, and providing a 1-800 number that Calleja could have called to inquire about his missing statements. Under the court of appeals' interpretation of the 2008 deposit agreement, the Bank could not activate Calleja's duties under section 4.406 by any means other than sending the statements to the brother's address. Having determined that the Bank neither sent the statements to Calleja nor made them available to him, the court of appeals held that Calleja's statutory duties to examine statements and report unauthorized transactions never arose. After rejecting the Bank's other arguments, the court of appeals rendered judgment "that Calleja is entitled to a refund from the Bank in the amount of the unauthorized withdrawals from his account."

## II. Analysis

We agree with the trial court that section 4.406 of the Business and Commerce Code shields the Bank from liability for the losses Calleja's account sustained due to fraud. As described in Part A below, although the Bank sent statements to the imposter's address, it made the statements available to Calleja by other means, triggering his statutory duties to promptly examine the statements and report the fraud. The only remaining question is whether the deposit

5

agreements modify the statute to require a result different from that dictated by applying the text of section 4.406. As described in Part B, we conclude that they do not.[2]

Because this case presents only issues of statutory and contract interpretation, our review is de novo. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011) ("We review issues of statutory construction de novo."); *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999) ("When a contract is not ambiguous, the construction of the written instrument is a question of law for the court.").

### A. Section 4.406

Under provisions of the Uniform Commercial Code that have been incorporated into Texas law, a bank can be liable to its account holder for losses incurred when an imposter takes over the account. Section 4.401(a) provides that "[a] bank may charge against the account of a customer an item that is properly payable from that account." TEX. BUS. & COM. CODE § 4.401(a). "An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank." *Id.* When a bank makes a payment to an unauthorized person, "[s]ection 4.401, which states that a bank may only charge items against a customer's account that are properly payable, is the source of a customer's substantive right to recover" from the bank. *Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 95 (Tex. 2000).

We have previously stated that a bank account such as the account at issue here creates a debtor-creditor relationship, under which "a bank may only pay out money in accordance with a

---

[2] The trial court also awarded attorney fees to the Bank. Calleja argued in the court of appeals that the fees awarded against him were improper, but that court did not reach this issue other than to vacate the award of fees to the Bank because it was no longer the prevailing party. 508 S.W.3d at 807 n.4.

6

customer's order," and the bank "bears the burden of demonstrating proper payment." *Fed. Deposit Ins. Corp. v. Lenk*, 361 S.W.3d 602, 606 (Tex. 2012) (*Lenk II*). "Given the debtor-creditor relationship between a bank and a customer and the corresponding requirement that the bank must repay any deposits to the customer, a breach action for such a refusal [to repay deposits] includes funds that were wrongfully paid out by a bank." *Id.* at 607 (emphasis, citation omitted). "Under Article 4's liability scheme, a bank is liable to its customer if it charges the customer's account for an item that is not properly payable from that account." *Martin*, 29 S.W.3d at 91.

Although the bank's liability for unauthorized charges serves as the default rule, the Code also contains exceptions to this rule. Here, the Bank argues that the exceptions in section 4.406 require Calleja to bear the loss under these circumstances. TEX. BUS. & COM. CODE § 4.406.[3] This section provides, in part:

> **Sec. 4.406. Customer's Duty to Discover and Report Unauthorized Signature or Alteration.**
>
> (a) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. . . .
>
> . . . .
>
> (c) If a bank sends or makes available a statement of account or items pursuant to Subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or

---

[3] The Bank also argues that Calleja is responsible for the losses under section 3.406. The court of appeals rejected this argument. 508 S.W.3d at 805–07. Because section 4.406 bars Calleja's claims on its own, we do not reach the applicability of section 3.406.

items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

(d)  If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by Subsection (c), the customer is precluded from asserting against the bank:

(1)  the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and

(2)  the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

. . . .

(f)  Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (Subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. . . .

When it comes to statutes, "[t]he text is the alpha and the omega of the interpretive process." *BankDirect Capital Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017). "Words and phrases that are not defined by statute and that have not acquired a special or technical meaning are typically given their plain or common meaning." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015).

Section 4.406 describes consequences that follow when a bank "sends or makes available to a customer" a monthly bank statement showing account transactions. Calleja argues that the statements sent to the imposter were not sent "to a customer" as contemplated by subsection 4.406(a). On this point, he relies on our decisions in *Lenk I* and *Lenk II*. In those cases, a

8

probate clerk stole funds from deceased customers' accounts by presenting a false letter of administration to the banks. In both cases, the later-appointed administrator of the estates sued the bank to recover amounts stolen from the customers' accounts. We held in *Lenk I* that bank statements sent to the defrauder did not trigger section 4.406 because they were not sent "to a customer" as required by subsection 4.406(a). 323 S.W.3d at 149; *see also Lenk II*, 361 S.W.3d at 607–08. Even if this reasoning applies to a living customer like Calleja, the question remains whether the statements were "made available" to Calleja even though they were not sent to him.

Section 4.406 applies when the bank sends *or* makes available a statement to the customer. TEX. BUS. & COM. CODE § 4.406(a), (c). For both elements of the disjunction to have effect, there must be ways banks can make statements available without physically sending them to customers. *See Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 402 (Tex. 2000) (noting that, where possible, statutory language should not be treated as surplusage); *Texas Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000) (stating that every word in a statute is presumed to have a purpose and should be given effect if reasonable and possible). The statute does not define what it means to "make available" a statement to a customer. The phrase should therefore be given its plain or common meaning. *Lipsky*, 460 S.W.3d at 590. "Available" commonly means "[a]t disposal; accessible or attainable; obtainable." *Available*, WEBSTER'S NEW INT'L DICTIONARY (2nd ed. 1960). As used in section 4.406, "makes available" includes various ways a bank might put the statements at the customer's disposal or enable the customer to access or obtain the statement without sending it in

9

the mail. *See Lenk I*, 323 S.W.3d at 149 (holding that statements were not sent to the customer under section 4.406 but were made available under that provision).[4]

The distinction between sending the statements and making them available is dictated by the statutory text and is consistent with our decisions in *Lenk I* and *Lenk II*. In those cases, we held that mailing a statement to an imposter does not amount to sending the statement to the customer for purposes of section 4.406. We also held in *Lenk I* that the statements were nevertheless "made available" to the estate representative. *See Lenk I*, 323 S.W.3d at 149. Just as in *Lenk I*, the conclusion that statements were not "sent" to Calleja does not necessarily mean they were not "made available" to him under section 4.406. As for what it takes to make a statement available, the *Lenk* decisions were careful to decide that question only with respect to the deceased bank customers at issue. They reached no broad conclusions on how statements can or cannot be made available to living customers like Calleja.[5]

As in the *Lenk* cases, our conclusion in this case that the Bank made the statements available to Calleja is dictated by the particular circumstances present here. Calleja stopped receiving bank statements a year and a half before he reported a problem. He does not dispute that he could have called the Bank at the 1-800 number provided on his previous statements to ask why the statements stopped arriving. He does not dispute that he could have requested copies of any of the statements by phone, or that he could have obtained copies by visiting any

---

[4] *See also Kaplan v. JPMorgan Chase Bank, N.A.*, 2015 WL 2358240, at *7 (N.D. Ill. May 12, 2015) (holding that statements were made available to customer under UCC § 4-406 because they were available online and customer could obtain statements by requesting them in person or by phone, and rejecting customer's argument that the statements were not made available because she never "received them").

[5] For example, in *Lenk I*, we stated that the bank "made the statements available by retaining them for the estate representative," but we immediately qualified this holding by observing, "When a bank is aware of a customer's death, it has no means of satisfying its section 4.406 burden other than by retaining the statements." *Id.* at 149; *see also id.* at 150 n.7 (distinguishing a Georgia decision that concerned a living customer).

bank branch. He also does not dispute that he could have received copies of the statements or their equivalent by setting up online banking, which the Bank offered for free. Finally, he does not dispute that he failed for over a year to ascertain whether his brother continued to receive mailed statements. Having every reason to notice the paper statements were no longer coming and having several avenues of inquiry available to him, he made no effort to monitor his account until many months after the imposter drained it.

Calleja focuses on the fact that he never received the statements, but a Bank's statutory burden to make the statements available cannot amount to a burden to ensure a customer receives the statements. *See Martin*, 29 S.W.3d at 94 (stating that section 4.406 "place[s] the burden on those best able to detect unauthorized transactions so that further unauthorized transactions can be prevented, and this burden includes the risk of nonreceipt of account statements" (footnote omitted)). If it did, the Bank's statutory option to send *or* make available the statements would be illusory. In this case, no obstacle to obtaining the statements, whether of the Bank's making or otherwise, stood in Calleja's way. He had every reason, had he paid attention, to discover that the statements were no longer being mailed to his brother's address and to ask the Bank why this was so. The record contains no indication that Calleja would have encountered any difficulty or burden in obtaining the statements had he desired to see them. Under these circumstances, the statements were "available" to Calleja under the common meaning of that term. We conclude that all the bank statements showing the depletion of Calleja's account were made available to him by the Bank for purposes of section 4.406.

When a bank customer waits more than one year after a statement has been made available to report an unauthorized signature reflected on the statement, subsection 4.406(f)

protects banks from liability "[w]ithout regard to care or lack of care of either the customer or the bank." TEX. BUS. & COM. CODE § 4.406(f). We have previously described subsection 4.406(f) as a statute of repose. *Lenk II*, 361 S.W.3d at 608–09; *Lenk I*, 323 S.W.3d at 147 & n.2. Statutes of repose have an "absolute nature." *Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin*, 307 S.W.3d 283, 287 (Tex. 2010). They "begin to run on a readily ascertainable date, and unlike statutes of limitations, a statute of repose is not subject to judicially crafted rules of tolling or deferral." *Id.* at 286. Indeed, their key purpose is "to create a final deadline for filing suit that is not subject to any exceptions, except perhaps those clear exceptions in the statute itself." *Id*. (footnote omitted).

Applying subsection 4.406(f) to Calleja's claims, the bulk of the transactions he challenges were listed on his bank statements more than one year before he discovered and reported the transactions. Subsection 4.406(f) bars his claims against the Bank regarding these unauthorized withdrawals. The imposter ordered checks and changed the address for receipt of the statements in June 2012, which was reflected on the statement made available in early July. The $38,700 check that drained most of the funds from the account was paid in July 2012, and that transaction was recorded in the statement made available in early August 2012. These and other transactions were recorded in statements made available to Calleja more than one year before he notified the Bank of a problem with his account in January 2014. Subsection 4.406(f) bars Calleja's claims against the Bank regarding these transactions.

Subsection 4.406(f) does not bar claims Calleja may have for unauthorized charges that occurred less than one year before statements reflecting the charges were made available. Calleja discovered and reported the fraud on January 24, 2014. In January and February 2013,

12

the account continued to be depleted by fees and small transactions that totaled approximately $3,900, until the account was completely depleted in February 2013. The January statement was prepared and made available in February 2013. Thus, some small transactions were recorded in statements made available to Calleja less than one year before he notified the Bank of the fraud. Subsection 4.406(f) does not apply to this small percentage of Calleja's losses.

Recovery of these remaining amounts is nevertheless barred by subsection 4.406(d)(2), which provides that, after an initial unauthorized withdrawal, subsequent withdrawals "by the same wrongdoer" cannot be recovered from the Bank if "the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank." The UCC's official comment accurately explains the effect of this provision:

> Subsection (d)(2) applies to cases in which the customer fails to report an unauthorized signature or alteration with respect to an item in breach of the subsection (c) duty . . . and the bank subsequently pays other items of the customer with respect to which there is an alteration or unauthorized signature of the customer and the same wrongdoer is involved. If the payment of the subsequent items occurred after the customer has had a reasonable time (not exceeding 30 days) to report with respect to the first item and before the bank received notice of the unauthorized signature or alteration of the first item, the customer is precluded from asserting the alteration or unauthorized signature with respect to the subsequent items. . . .
>
> . . . .
>
> . . . One of the most serious consequences of failure of the customer to comply with the requirements of subsection (c) is the opportunity presented to the wrongdoer to repeat the misdeeds. Conversely, one of the best ways to keep down losses in this type of situation is for the customer to promptly examine the statement and notify the bank of an unauthorized signature or alteration so that the bank will be alerted to stop paying further items. . . .

13

TEX. BUS. & COM. CODE § 4.406 cmt. 2. As to the subsequent transactions occurring within one year of Calleja's January 2014 notification to the Bank, all of them occurred long after Calleja had been afforded "a reasonable period of time . . . to examine" the statements recording the original forgeries. *Id.* § 4.406(d)(2). Claims against the Bank as to these later forgeries are therefore subject to subsection 4.406(d)(2).

Subsection 4.406(d)(2) only bars Calleja's claims for the small amounts at issue if the banks paid these amounts "in good faith." The statute defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." TEX. BUS. & COM. CODE § 1.201(b)(20). Calleja does not allege that the Bank failed to act honestly, and nothing in the record would support that conclusion. Calleja also does not point to any evidence of the Bank's failure to observe reasonable commercial standards with respect to the small transactions that drained his account after January 2013. Calleja suggests in his brief that the Bank did not observe reasonable commercial standards when it paid the $38,700 check in July 2012. As discussed above, however, subsection 4.406(f) bars Calleja's claims regarding this transaction "[w]ithout regard to care or lack of care" by the Bank. Calleja makes no argument—and the record contains no evidence—that the Bank failed to observe reasonable commercial standards with respect to the small transactions that occurred after January 2013. The Bank paid these amounts several months after Calleja had the opportunity to discover the fraud and alert the Bank. As we have previously observed, "[b]ecause the customer is more familiar with his own signature, and should know whether or not he authorized a particular withdrawal or check, he can prevent further unauthorized activity better than a financial institution, which may process thousands of transactions in a single day." *Martin*, 89 S.W.3d at 92. Subsection 4.406(d)(2) bars

14

Calleja's claims against the Bank for unauthorized charges not already barred by subsection 4.406(f).

In sum, assuming section 4.406 applies as written, Calleja's claims against the Bank are barred by either subsection 4.406(f) or subsection 4.406(d)(2).

## B. The Account Agreements

For the reasons explained, section 4.406 shields the Bank from liability for losses to Calleja's account under a straightforward application of the statute as enacted by the legislature. However, like most other UCC provisions, the terms of section 4.406 "may be varied by agreement." TEX. BUS. & COM. CODE § 4.103(a). The record contains two deposit agreements, a 2008 agreement and a 2012 agreement,[6] and we must examine their effect, if any, on the parties' obligations in these circumstances.

The parties, the trial court, and the court of appeals focused to some extent on a provision of the agreements concerning the customer's obligation to notify the Bank of account irregularities. The 2008 agreement states:

> Our records regarding your accounts will be deemed correct unless you timely establish with us that we made an error. It is essential that any account errors . . . unauthorized transactions, alterations, forgeries . . . or any other improper transactions on your account (collectively referred to as "exceptions") be reported to us as soon as reasonably possible. . . . You agree that you will carefully examine each account statement or notice you receive and report any exceptions to us promptly after you receive the statement or notice. You agree to act in a prompt and reasonable manner in reviewing your statement or notice and reporting any exceptions to us. If you do not report an exception to us within thirty (30) days after we send the statement or notice to you, you agree that we will not be liable to you for any loss you suffer related to that exception.

---

[6] The record also contains a 2013 agreement, but it is irrelevant to our analysis.

15

The 2012 agreement had a similar provision, but (as shown with emphasis) modified the last sentence quoted above to state:

> If you do not report an exception to us within thirty (30) days after we send *or make the statement or notice available to you*, you agree that we will not be liable to you for any loss you suffer related to that exception and that you cannot later dispute the transaction amounts and the information contained in the statement.

Calleja contends that the 2008 agreement applies to him because the later agreement was never sent to him. In order to address Calleja's arguments, we will assume without deciding that the 2008 agreement applies.

We understand the quoted language in the 2008 agreement primarily as an attempt to shorten the repose period of subsection 4.406(f) from one year to 30 days if the Bank sends the statement to the customer. In *Martin*, we held that the statutory repose period could be shortened to 60 days by agreement. 29 S.W.3d at 89, 99[7]; *see also Lenk I*, 323 S.W.3d at 150 (noting that the statutory one-year repose period "can be contractually shortened by agreement"). We need not decide whether the Bank could enforce the 30-day repose period contained in these agreements. As explained above, even under the unmodified one-year repose period in subsection 4.406(f) and under other provisions of that statute, Calleja's claims are barred.

Contracts, like statutes, should be construed based on their plain language. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (explaining that the Court "give[s] terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense"). The above-quoted provision from the 2008 agreement enhances the Bank's rights when it sends statements to the customer. Calleja

---

[7] At the time, the one-year repose period now found in subsection 4.406(f) was found in subsection 4.406(d). *See Martin*, 29 S.W.3d at 91–92 & n.17.

16

contends that, in so doing, the provision also eliminates statutory protections the Bank has when it merely makes the statements available.  The argument seems to rest on the assumption that any contractual amendment affecting some applications of subsection 4.406(f) replaces subsection 4.406(f) in its entirety.  This is incorrect.  The proper inquiry is whether the statutory provision and the contractual provision contain conflicting rules governing the same circumstance.  Here, they do not.  The 2008 agreement says that if the Bank sends the statement to the customer, the repose period becomes 30 days.  It also obligates the customer to carefully examine statements he receives and report problems promptly after receipt.  These provisions alter the parties' obligations when the Bank *sends* statements.  They do not say or suggest that the Bank cannot trigger the statute's one-year repose period by making the statements *available* through other means.  Section 4.406 contains protections for banks that send statements and protections for banks that make statements available.  These protections frequently overlap, but not always. *Compare* TEX. BUS. & COM. CODE § 4.406(a) (applicable when banks send statements or make them available), *with id.* § 4.406(f) (applicable only when banks make statements available).  A contractual amendment to one set of protections does not automatically extinguish the other set of protections absent some indication the parties intended to do so.  No such indication exists in the 2008 agreement.  The statutory provisions applicable when the Bank makes statements available remained in place.  Those provisions bar Calleja's claims.

Calleja also contends that the parties' agreement supplies a restrictive definition of "made available" for purposes of section 4.406.  The court of appeals agreed, relying on the following provision, found in both the 2008 and 2012 agreements:

> We may make statements, canceled checks (if applicable to your account), notices
> or other communications available to you by holding all or any of these items for

you, or delivering all or any of these items to you, in accordance with your request or instructions.

The court of appeals concluded that, with this sentence, "the parties contractually limited the ways in which the Bank could make account statements available to Calleja, and both parties are bound by this limitation." 508 S.W.3d at 803. Under this reasoning, once Calleja asked the Bank to send statements to his brother, the statutory protections that apply when the bank makes the statements available through other means were eliminated.

We disagree. Calleja puts much more weight on this provision than it can bear. The quoted contractual language does not express an intent to dispense with all the statutory limitations on liability that apply when the Bank makes the statements available through means other than sending them. The provision says the Bank *may* make statements available to the customer by holding them or sending them to the customer in accordance with instructions. It does not say or suggest that the Bank *may not* make the statements available through other means as contemplated by section 4.406. It does not provide that the *only way* the Bank can invoke section 4.406's protections is to mail statements to a customer who requests such notice. Most importantly, the provision is not phrased as a definition of "made available" for use in the application of section 4.406, nor does its text indicate the parties intended it to serve that purpose. The provision does not conflict with the statute. It gives the customer a choice between mailed statements and statements held at the Bank. It does not give the customer the right to opt out of the statutory duties imposed by the legislature on customers to whom statements are made available. We conclude that the proffered agreements, whichever one applies, do not alter the portions of section 4.406 that operate to bar Calleja's claims against the Bank.

18

### III. Conclusion

The trial court correctly concluded that section 4.406 bars Calleja's claims, and the court of appeals erred in reversing the trial court's judgment. In the court of appeals, Calleja argued that for various reasons the trial court should not have awarded attorney fees to the Bank even if the Bank was entitled to summary judgment. The court of appeals did not reach those arguments because it reversed the trial court's judgment for the Bank, including the award of fees. Accordingly, we reverse the court of appeals' judgment and remand the case to the court of appeals for further proceedings consistent with this opinion.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** December 21, 2018

19