**Affirmed; Opinion Filed December 4, 2019.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-18-00900-CV

**METROMARKE MULTIFAMILY DEVELOPMENT FUND I, L.P., Appellant**
**V.**
**RRAC DEVELOPMENT GP, LLC AND GFD MARKET RATE GROUP I, LLC,**
**Appellees**

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-08666**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Reichek, and Carlyle
Opinion by Justice Carlyle

This is a dispute over the transfer of an interest in a limited partnership (the "Partnership").

Both sides asserted competing claims for breach of contract and declaratory judgment. Following

a bench trial, the trial court (1) ruled in favor of appellees RRAC Development GP, LLC and GFD

Market Rate Group I, LLC; (2) awarded appellees damages and appellate attorney's fees; and

(3) ordered appellant MetroMarke Multifamily Development Fund I, L.P. to convey its Partnership

interest to RRAC with an indemnity containing certain specified terms.

On appeal, MetroMarke contends (1) the trial court erred by concluding MetroMarke "had

to release its legal claims relating to management under the indemnity for conveyance of its

partnership interest" and (2) there is legally insufficient evidence of MetroMarke "causing damages to RRAC and GFD."[1] We affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## I. Background

In 2015, the Partnership had three owners: general partner RRAC owned .1%; limited partner MetroMarke owned 90%; and limited partner GFD owned 9.9%. During that year, the Partnership acquired land in Round Rock, Texas, on which it planned to develop an apartment complex (the "Project").

Under section 13.1 of the Partnership Agreement, each partner had the right, under certain circumstances, to issue a "Buy-Out Notice" to any other partner requiring that partner to either (1) sell its partnership interest to the issuing partner, or (2) buy out the issuing partner's interest. Upon receiving a Buy-Out Notice, the responding partner had thirty days to elect one of those choices. The Partnership Agreement (1) required that the closing date for any buy-out be within sixty days of the responding partner's election and (2) set the purchase price based on the selling partner's total capital contributions. Further, section 13.1 stated, "The interest being conveyed shall be transferred free and clear [of] any and all Claims, and shall include an indemnity from the Partner conveying its interest in a form acceptable to the Partner acquiring such interest."[2]

In July 2016, MetroMarke filed this lawsuit against RRAC, alleging Partnership Agreement violations and requesting a declaratory judgment regarding its rights to remove RRAC

---

[1] MetroMarke also contends on appeal that if this court sustains either of those two issues, we should remand the case for reconsideration of attorney's fees. We do not sustain either of those issues.

[2] The Partnership Agreement defined "Claim" as

> any and all claims, costs (including attorneys' fees and court costs), damages, debts, demands, expenses, liabilities, losses, actual or derivative obligations, agreements, express or implied warranties, sums of money, fines, penalties, accounts, bills, covenants, contracts, claims of indemnity, claims of contribution, promises, representations, trespasses, damages, harm, injuries, judgments, executions, controversies, suits, proceedings, actions or causes of action of any kind or character whatsoever, whether at law, in equity, by statute or otherwise, whether known, unknown, suspected or unsuspected.

as general partner.[3] While the lawsuit was pending, MetroMarke issued a Buy-Out Notice to RRAC. RRAC elected on March 30, 2017, to buy out MetroMarke's Partnership interest and sent MetroMarke a proposed buy-out agreement that contained an indemnity. MetroMarke responded by sending RRAC its own proposed buy-out agreement, which contained a differently-worded indemnity.[4]

RRAC rejected MetroMarke's proposed buy-out agreement, stating (1) RRAC "has been categorically informed by its lenders that [MetroMarke's proposed buy-out agreement] renders them unable and unwilling to proceed to provide the necessary funds to close the transaction" and (2) by insisting on the terms in its proposed buy-out agreement, MetroMarke is "in default of its obligations under the Partnership Agreement including section 13.1 thereof," and has caused the buy-out "to be impossible to consummate."

RRAC and GFD then asserted counterclaims against MetroMarke for breach of contract— for failing, in essence, to provide an indemnity "in a form acceptable to" RRAC—and for declaratory judgment—again, in essence, that section 13.1 required MetroMarke to provide RRAC an indemnity acceptable to it and allowed RRAC to reject an indemnity that did not indemnify it against those claims or causes of action MetroMarke had brought against RRAC in the lawsuit. RRAC and GFD also requested an order specifically enforcing RRAC's right to acquire

---

[3] MetroMarke added GFD as a defendant in early 2017.

[4] MetroMarke's proposed buy-out agreement stated (1) "Seller shall indemnify Buyer . . . from and against all claims, judgments, damages, liabilities, settlements, losses, costs, and expenses, including attorneys' fees and disbursements (a "Loss"), arising from or relating to Seller's failure to transfer the Partnership Interests free and clear of all Claims; provided, however, nothing anything [sic] contained in this Agreement to the contrary, Seller's indemnity obligations shall not (under any circumstances) include any obligation by Seller or any of its Affiliates to indemnify, defend or otherwise hold Buyer or any other Indemnified Parties harmless from any Loss arising out of, related to, or in connection with, the Lawsuit or any Retained Rights and Claims, all of which shall survive the Closing"; (2) "Retained Rights and Claims" includes "any Claims which Seller has or may have against Buyer . . . arising out of, related to, or in connection with the breach of the terms of this Agreement, the Partnership Agreement or otherwise, including without limitation, any Claims which are now or hereafter alleged by Seller in [the lawsuit]"; and (3) "Claim" means "any and all claims, costs (including attorneys' fees and court costs), damages, debts, demands, expenses, liabilities, losses, actual or derivative obligations, agreements, express or implied warranties, sums of money, fines, penalties, accounts, bills, covenants, contracts, claims of indemnity, claims of contribution, promises, representations, trespasses, harm, injuries, judgments, executions, controversies, suits, proceedings, actions or causes of action of any kind or character whatsoever, whether at law, in equity, by statute or otherwise, whether known, unknown, suspected or unsuspected."

Also, MetroMarke's proposed buy-out agreement required RRAC to "acknowledge, stipulate, and agree" that "the sale of the Partnership Interests does not include the sale, assignment, transfer or conveyance of [the Retained Rights and Claims], and . . . Seller is entitled to all right, title and interest in and to the Partnership Interests, and all rights and benefits as a Limited Partner and as [MetroMarke] which accrued, or otherwise arose under or in connection with, the terms of the Partnership Agreement, on or before the Effective Date of this Agreement."

MetroMarke's interest in the Partnership for the agreed price, $3,311,468.01, and requiring an indemnity in a form acceptable to RRAC.

MetroMarke filed an amended petition, asserting (1) it "timely and properly" delivered its indemnity "in strict accordance with the Partnership Agreement" and (2) RRAC "wrongfully rejected" MetroMarke's indemnity and "unlawfully demanded that MetroMarke end this lawsuit and waive all claims of whatever nature that MetroMarke has against RRAC and the other defendants," which "is not required by the Partnership Agreement."

Following a four-day bench trial, the trial court signed a judgment in which it (1) declared that under section 13.1, "MetroMarke was required to agree to indemnify RRAC against any and all claims or causes of action MetroMarke had brought against RRAC in this lawsuit" and "RRAC had the contractual right to reject as unsatisfactory an indemnification that did not indemnify it against those claims or causes of action and to insist on an indemnification that protected it from those claims or causes of action"; (2) awarded RRAC and GFD $2,764,555.00 in damages against MetroMarke; (3) ordered that MetroMarke transfer its Partnership interest to RRAC "for the price of $3,311,468.01 (less offsets for any amounts adjudged against [MetroMarke] in this Judgment)" and provide RRAC with "an indemnity in form acceptable to [RRAC]"; and (4) provided for attorney's fees to RRAC in the event of an unsuccessful appeal by MetroMarke.

## II. The indemnity obligation

In reviewing declaratory judgments, we look to the procedure used to resolve the issue at trial to determine the appropriate standard of review. *See* TEX. CIV. PRAC. & REM. CODE § 37.010; *Castille v. Serv. Datsun, Inc.*, No. 01-16-00082-CV, 2017 WL 3910918, at *13 (Tex. App.— Houston [1st Dist.] Sept. 7, 2017, no pet.) (mem. op.). Thus, in this case, we review the trial court's declarations under the standard applicable to contract interpretation, which is de novo. *See Compass Bank v. Calleja-Ahedo*, 569 S.W.3d 104, 108 (Tex. 2018).

–4–

Our primary objective in construing contracts is to give effect to the written expression of the parties' intent. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). "[A] contract's plain language controls, not what one side or the other alleges they intended to say but did not." *Id*. We therefore look to "[o]bjective manifestations of intent" and, in doing so, we must "'presume parties intend what the words of their contract say' and interpret contract language according to its 'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise." *Id*. If the contract's language can be given a definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012); *see also E.I. DuPont Nemours & Co. v. Shell Oil Co*., 259 S.W.3d 800, 805 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("Indemnity agreements must be strictly construed, pursuant to the usual principles of contract interpretation, in order to give effect to the parties' intent as expressed in the agreement.").

In its first issue, MetroMarke contends the trial court "erroneously interpreted the requirement of acceptable ***form*** as empowering the purchasing partner to expand the ***scope*** of indemnity to embrace claims and risks unrelated to the interest being conveyed." According to MetroMarke, (1) the only "common-sense reading" of section 13.1's indemnity provision is "[h]aving paid for the interest, the acquiring partner was entitled to receive it without worrying about anyone coming forward with a competing claim of ownership"; (2) "[t]hus, the selling party would indemnify the acquiring party against the risk of any claim associated with ownership of the conveyed interest"; (3) "[t]he indemnity is for ownership of the interest being conveyed—not legal claims having nothing to do with ownership of that interest"; (4) "RRAC was entitled to indemnification against claims on the interest—not a get-out-of-jail-free card for all manner of

legal claims that might exist between partners"; and (5) "RRAC's argument would mean it could require MetroMarke to indemnify it against lawsuits totally unrelated to the partnership."

We disagree, because the plain language of the contract guides us. Section 13.1 does not require indemnification only against "a completing claim of ownership." Nothing in the provision describes such a limitation. *See Pathfinder*, 574 S.W.3d at 888. It is only by adding words and importing meaning that MetroMarke's argument could prevail. Further, we disagree with MetroMarke's position that the claims it sought to reserve were not "associated with ownership of the conveyed interest." Regardless of whether standing would have existed for any of the claims in question, those claims pertained directly to rights and obligations under the Partnership Agreement. The contract defined the "claims" a buyer was required to indemnify against, and that definition included "actions or causes of action of any kind or character whatsoever, whether at law, in equity, by statute or otherwise, whether known, unknown, suspected or unsuspected." *See supra* note 2. The trial court did not err by concluding section 13.1's indemnity provision required MetroMarke to agree to indemnify RRAC against all claims in the lawsuit.

**III. Damages**

The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pulley v. Milberger*, 198 S.W.3d 418, 427 (Tex. App.—Dallas 2006, pet. denied). When, as here, the trial court does not file express findings of fact and conclusions of law, we presume the trial court made all necessary findings to support the judgment. *See Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017). If those implied findings are supported by the evidence, we must uphold the judgment on any theory of law applicable to the case. *Sink v. Sink*, 364 S.W.3d 340, 344–345 (Tex. App.—Dallas 2012, no pet.).

In reviewing a trial court's findings of fact, we apply the same legal sufficiency standard used when determining if sufficient evidence exists to support an answer to a jury question. *Sheetz*

*v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.). When an appellant challenges the legal sufficiency of an adverse finding on which he did not have the burden of proof at trial, he must demonstrate there is no evidence to support the adverse finding. *Id*. If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails. *Id*.; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) ("More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). As long as the evidence falls "within the zone of reasonable disagreement," we will not substitute our judgment for the fact-finder's decisions. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

To recover damages for breach of contract, a plaintiff must prove the defendant's breach caused the damages. *See, e.g., Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 354–55 (Tex. App.—San Antonio 1998, pet. denied). The evidence must show the damages were the natural, probable, and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981).

In its second issue, MetroMarke asserts the trial court's damages award "lacks legally sufficient supporting evidence" regarding causation. According to MetroMarke, (1) "[t]he damages were increased construction costs due to project delays"; (2) although RRAC "blamed [MetroMarke] for preventing the start of construction in 2017," RRAC "failed to introduce any evidence of its ability to close the necessary construction loan in 2017"; and (3) the testimony appellees rely on is "speculative."

At trial, Andrew Carnahan testified he is an owner and partner of RRAC's operating entity. He has a business degree "in real estate finance" and his "main focus" is "locating debt and equity for our projects." He stated that in 2017 he "arranged financing for the full price of the buyout."

–7–

That financing included a $1.8 million loan from investment group EMPAC Capital Partners that "was convertible to equity at a later date." Further, he stated that in May 2017, RRAC planned that after closing the buy-out, "we were going to move to . . . start construction on the apartments." Carnahan testified,

> Q. Had you—what did—or had you done anything as far as the real estate financing aspect of that plan?
>
> A. Yes. We spoke to another lender and we were going to—we were going to use them to obtain a HUD insured loan. And EMPAC, of course, their loan was convertible and their interest was to convert their loan to equity. And they had the right put [sic] in the remainder of the equity to complete the construction loan closing.
>
> Q. And what was the timing?
>
> A. Our estimate was about four months, which would have been September of 2017.
> . . . .
> Q. Who was lender?
>
> A. Gershman Mortgage.
>
> Q. And had they committed to make the loan for construction in September—to close in September 2017?
>
> A. Yes. They—they need approval from HUD and then they will close the loan.
> . . . .
> Q. Okay. Now, did you have a plan at this point about the equity and debt component?
>
> A. Yes. As we just discussed, HUD was the—HUD was—HUD was insuring the loan for the lender. And then, EMPAC, who was involved in the buyout, their plan was to convert their loan to the equity and provide the rest.
>
> RRAC's president Justin Bailey testified,
>
> Q. Would there have been any requirements of any additional funding or any additional loans to be made for the HUD loan to close?
>
> A. There would have been additional equity required above and beyond what the partnership had in it. If that's what you're asking.
> . . . .
> Q. How much more equity would have been needed?

A. . . . I want to say it was in the neighborhood of just under 2 million.

Also, EMPAC's representative, Thomas Harnsberger, testified via video deposition. He stated that EMPAC was "potentially going to be involved" in the Project and was "going to provide a mezzanine loan convertible to equity in the acquisition by the sponsor of the transaction."

MetroMarke cites *Nelson v. Sheedy*, No. 05-16-01262-CV, 2018 WL 2434389 (Tex. App.—Dallas May 30, 2018, pet. denied) (mem. op.), which it contends is "no different" from this case. In *Nelson*, a party to a failed transaction testified he would have obtained the financing necessary to consummate the transaction had it proceeded. Specifically, in response to the question of whether he "had financing available," the *Nelson* witness stated, "I mean, I explored that. I would have gone to the banks if the offer was accepted, yes." *Id*. at *8. Then, that witness was asked, "Did you feel confident that you could get that accomplished?" He stated, "I think so; otherwise I wouldn't have stated the offer sir." *Id*. This court concluded that evidence was speculative and, therefore, no evidence of the witness's ability to fund the transaction. *Id*. at *8–9.

*Nelson* does not compel reversal here. Unlike *Nelson*, the evidence here goes beyond having "explored" available financing. We disagree with MetroMarke's assertion that "neither Bailey nor Carnahan testified that EMPAC intended to exercise its right to provide the equity." To intend is "to have in mind as a purpose; plan." *See Intend*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (3rd ed. 1997). Carnahan testified in part, ". . . HUD was insuring the loan for the lender. And then, EMPAC, who was involved in the buyout, their plan was to convert their loan to the equity and provide the rest." This testimony, at least, differentiates this case from *Nelson*.[5] In our role, reviewing the record for sufficiency, we conclude there is more than a scintilla of

---

[5] We note that in *Nelson*, the panel affirmed the grant of summary judgment. *See id*. at *9. To reverse a fact-finder's conclusion based on *Nelson*, our record would have to be both far more like the *Nelson* exchange and far less supportive of a conclusion that "reasonable and fair-minded people" could "differ in their conclusions" based on it. *See King Ranch*, 118 S.W.3d at 751.

evidence to support causation regarding the damages awarded. *See Mead*, 615 S.W.2d at 687; *see also King Ranch*, 118 S.W.3d at 751.[6]

## IV. Conclusion

We decide against MetroMarke on its first and second issues. Consequently, we need not reach MetroMarke's third issue. We affirm the trial court's judgment.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

180900F.P05

---

[6] For the first time at oral argument, appellant articulated a contention that the rule against inference-stacking rendered the damages evidence insufficient. Appellant cited *Nelson*, which, as noted, was cited in appellant's reply brief. Though *Nelson* does discuss inference-stacking, appellant never relied on it in that respect, instead analogizing it because we concluded summary judgment evidence in that case was speculative. Assuming it was appropriate for counsel to argue against sufficiency on a brand-new basis at oral argument (*cf.* TEX. R. APP. P. 39.2, "Oral argument should emphasize and clarify the written arguments in the briefs."), we see no impermissible inference-stacking. What counsel described as inferences the trial court must have stacked were independent facets of the evidence sufficiently supporting the trial court's damages finding.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

METROMARKE MULTIFAMILY
DEVELOPMENT FUND I, L.P., Appellant

No. 05-18-00900-CV          V.

RRAC DEVELOPMENT GP, LLC AND
GFD MARKET RATE GROUP I, LLC,
Appellees

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-08666.
Opinion delivered by Justice Carlyle.
Justices Pedersen, III and Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees RRAC DEVELOPMENT GP, LLC and GFD MARKET RATE GROUP I, LLC recover their costs of this appeal from appellant METROMARKE MULTIFAMILY DEVELOPMENT FUND I, L.P.

Judgment entered this 4th day of December, 2019.