

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00321-CV

———————————————

IN THE ESTATE OF DOLORES ELIZABETH DOUGLAS, DECEASED; DEREK DOUGLAS AND CHARLES DOUGLAS, JR., BOTH INDIVIDUALLY AND CHARLES DOUGLAS JR., DEPENDENT ADMINISTRATOR OF THE ESTATE OF DOLORES ELIZABETH DOUGLAS, DECEASED, Appellants

V.

THE CASTILLIAN CONDOMINIUMS, INC. AND RONALD W. HARRIS, Appellees

On Appeal from Probate Court No. 1
Tarrant County, Texas
Trial Court No. 2019-PR00577-1-A

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

## I. Introduction

Appellants Derek Douglas and Charles Douglas Jr., individually, and Charles Douglas Jr., dependent administrator of the Estate of Dolores Elizabeth Douglas (collectively, the Douglases), lost their inheritance—their mother Dolores's condominium and her personal property in it—when they failed to pay condominium assessments for several years after her death, ultimately resulting in Appellee The Castillian Condominiums, Inc.'s using nonjudicial foreclosure to sell Dolores's condo at public auction. The Castillian later sold the condo to Appellee Ronald W. Harris. The Douglases sued The Castillian for wrongful foreclosure, statutory theft, conversion, and negligence; sued both The Castillian and Harris for unjust enrichment and trespass to try title; and sought a declaration that The Castillian's and Harris's deeds were void. The trial court granted summary judgment on all of the Douglases' claims in favor of The Castillian and Harris.

The crux of the Douglases' three issues on appeal is that The Castillian could not use nonjudicial foreclosure. But the record and the law reflect otherwise, and the Douglases failed to raise a genuine issue of material fact that would preclude summary judgment on their other claims. Accordingly, we affirm.

## II. Background

The following timeline gives the background.

- 1999: Dolores obtains a home-equity loan, which the lender records in the county real-property records and ultimately assigns to Citibank.

- January 23, 2014: The Castillian notifies Dolores by certified and first class mail at her post office box address that she owes $472 in unpaid condominium assessments, warns her that collection proceedings could begin within 30 days, and advises her that a payment plan is available.

- May 16, 2014: Dolores dies without leaving a will. *See* Tex. Est. Code Ann. § 201.001(a)–(b) (providing that if a person who dies intestate does not leave a spouse, the estate to which the person had title descends and passes to her children).

- August 19, 2014: Dolores's loan servicer sends a demand letter to her condo's street address to inform her of her mortgage's default status for failure to make the July payment, plus late charges, and requires payment by September 18, 2014, to avoid the note's acceleration and foreclosure.

- Some point in 2014: Charles receives a phone call from "Hana who worked in [The Castillian's] office in 2014, wherein she inquired about [Dolores's] car. During that call she told [him] she would get back to [him] as to how much she believed was owed to the Condo Association on [Dolores's] condominium. She never called back."[1]

- March 18, 2015: The Castillian mails a letter about $5,218 in overdue condo assessments (plus $142 in attorney's fees) to "Estate of Dolores Douglas" at Dolores's post office box address and two variations of the condo's street address, as well as to Charles and Derek at the two variations of the condo's street address.

- May 1, 2015: The Castillian files a notice of lien against the condo for $6,229.40 for nonpayment of assessments and related charges and lists Dolores's

---

[1]The Castillian objected to this paragraph of Charles's affidavit but did not obtain a ruling. The Douglases also attached a portion of Jason Reed's deposition, in which Reed, who worked for The Castillian, testified that Dolores's obituary had indicated that she was survived by two sons, so they had Charles and Derek's names, "[b]ut no other information concerning, you know, where they lived or anything like that."

estate, Charles, and Derek as the condo's owners.[2] The Castillian also sends a letter and a copy of the notice of lien to "Estate of Dolores Douglas" at Dolores's post office box address and the condo's street address, as well as to Charles and Derek at the condo's street address, to advise them about the filing of the notice of lien, the first step in the foreclosure process.

- June 25, 2015: Citibank sues Charles and Derek to foreclose its lien.[3]

- August 5, 2015: The Castillian files a notice of assessment-lien sale and sends a letter to the same addresses where it sent the notice of lien, informing "Estate of Dolores Douglas," Charles, and Derek that the property will be sold at public auction on September 1, 2015, if the now-$8,582.38 in assessments and costs are not paid.

- September 1, 2015: The Castillian buys the condo at public auction.

- September 11, 2015: The Castillian records its deed in the county real property records, and, using the same addresses as before, sends a letter to "Estate of Dolores Douglas," Charles, and Derek to notify them of the September 1, 2015 sale and their 90-day right of redemption.

- November 2016: Charles and Derek begin negotiating with Citibank.

- February 9, 2017: Charles and Derek retain counsel to assist them in the Citibank lawsuit.

- March 2017: Charles and Derek settle with Citibank.

- April 14, 2017: Citibank releases its lien.

---

[2]Charles testified that he did not know that notices of lien were a type of instrument filed in the county real property records, but he agreed that instruments in the public records were something anyone could view or find. *See* Tex. Prop. Code Ann. § 13.002 (stating that an instrument that is properly recorded in the proper county is notice to all persons of the instrument's existence and is subject to the public's inspection).

[3]Charles testified that he learned about Citibank's lawsuit after the trial court appointed an attorney ad litem, who located him. Derek did not recall being served by Citibank.

4

- April 28, 2017: The Castillian pays $2,640 to Junk Guru Professional Junk Removal Services to have Dolores's personal property removed from the condo.[4]

- July 2017: Derek and Charles, who did not check the real property records themselves, learn that Citibank entered a release of lien.

- July 25, 2017: Harris contracts with The Castillian to buy the condo.

- October 17, 2017: Charles visits the condo, notices some of his mother's property is missing from the patio, and sees someone else's property inside through the condo's window.[5] He speaks with The Castillian's secretary, who tells him that the condo was sold. The Castillian's chairman tells Charles to leave and calls the police.[6]

- August 1, 2018: Charles and Derek sue The Castillian and Harris[7] to void their deeds under a wrongful-foreclosure theory and seek recovery for the loss of Dolores's personal property under the Texas Theft Liability Act (TTLA); alternatively, they seek restitution and recovery for unjust enrichment.

- February 22, 2019: Charles applies for independent administration of Dolores's estate.[8]

- May 20, 2019: Charles is appointed dependent estate administrator.

---

[4]The Castillian attached photographs of the condition of Dolores's condo and personal property to its summary-judgment motion.

[5]Charles did not try to go in because he had forgotten to bring the key with him.

[6]Charles did not make a police report about his mother's missing personal property because he was "chased off the property by the police" and was told that if he returned, he would be trespassing.

[7]Harris crossclaimed against The Castillian for breach of warranty of title, but the trial court dismissed this claim in the final judgment, and Harris has not appealed.

[8]Charles said that he had not filed for administration of Dolores's estate earlier because he and his brother had no dispute about the estate, and he did not think there was a need to file; Derek echoed his sentiment.

- August 20, 2019: Charles and Derek, along with Charles as estate administrator, file their fourth amended petition, adding a claim for trespass to try title.

- February 27, 2020: The case is transferred to the probate court.

- January 4, 2021: Harris files a traditional motion for summary judgment, arguing that he is a bona-fide purchaser for value without notice.

- January 26, 2021: The Douglases file a response to Harris's motion, arguing that the trustee's foreclosure deed was void because The Castillian lacked authority to conduct a nonjudicial foreclosure.

- February 8, 2021: The trial court grants Harris's summary-judgment motion.

- March 25, 2021: Harris sells the condo.

- April 27, 2021: The Douglases file their fifth amended petition, which adds a claim for negligence against The Castillian and an alternative claim for conversion.

- May 14, 2021: The Castillian files a traditional and no-evidence motion for summary judgment, arguing that its nonjudicial foreclosure was not wrongful, as well as arguing limitations, notice, and superior title, among other things.

- June 8, 2021: The Douglases respond to The Castillian's summary-judgment motion, arguing that fact issues preclude a traditional summary judgment and that a probate-code exception to limitations applies, among other things.

- July 9, 2021: The trial court renders a final judgment, granting The Castillian's motion and ordering a take-nothing judgment as to the Douglases.

In addition to the above facts, during their depositions, Charles and Derek testified that they had been aware in 2014 both that Dolores owed a monthly assessment payment to The Castillian and that there had been a mortgage on the condo. They nonetheless made no assessment payments, mortgage payments, or payments for taxes or insurance on the condo after Dolores died, and they did not

occupy the condo for any amount of time or attempt to rent or sell it after Dolores's death.

Charles and Derek also knew that Dolores had a post office box and where it was located; Derek did not check the post office box, but Charles did. Charles checked on the condo from time to time, and between May 16, 2014 and June 25, 2015—that is, after Dolores's death and before Citibank sued to foreclose its lien—he retrieved his mother's televisions and her computer from the condo, retrieved the contents of the unsecured mailbox next to the condo's front door (which he said contained only junk mail), and retrieved her bills from the post office box.[9] Charles paid the condo's electric bills once or twice before he turned off the electricity.

Charles testified that twice during the May 16, 2014–June 25, 2015 time period, he had attempted to call The Castillian's office to find out how much was owed on the assessments, "but no one answered."[10] Neither Charles nor Derek ever provided their contact information to The Castillian, the Tarrant County Appraisal District, or any other governmental agency or authority, and they did not give any utilities

---

[9]Charles testified that he had lived in Round Rock between 1993 and 2014, a two-and-a-half to three-hour drive to Dolores's condo. After Dolores purchased the condo in the 1990s, he had visited her there around "eight times a year." Derek had lived in Ohio at the same address since 1992.

[10]Derek stated that he asked Charles to contact The Castillian on his behalf to let it know that Dolores had died and to find out what she owed to the homeowners' association, but he did not recall when Charles contacted it. Derek said that they did not receive a response from The Castillian.

providers a new billing address or file a change of address form as the condo's owners with the United States Postal Service (USPS).

Charles went by the condo at least once in early 2016. He knew Philip, one of The Castillian's maintenance men, who had Charles's phone number. According to Charles, Philip called him at some point to tell him that someone had broken one of the condo's windows. The window was boarded up when Charles arrived, and the condo otherwise appeared to Charles to be secure, closed, and locked up, although a couple of items—his father's flag and a massage table—were missing. He did not call anyone to replace the glass in the broken window and did not make a police report about the missing items. He considered having an alarm installed after the break-in but did not because that would have required electricity.

Before March 3, 2017, neither Charles nor Derek examined the condo's title or looked at the Tarrant County real-property records for the condo. They both testified that their understanding of the mortgage payoff was to acquire the condo's title[11] and that their attorney had told them—before they made the payoff—that the condo had been valued by the Tarrant Appraisal District at $109,610 for 2016.

Between March 3, 2017 (when the Douglases paid off the Citibank mortgage) and July 27, 2017 (when Harris bought the condo), Charles did not check on the

---

[11]Derek stated that his understanding was that "[i]f the court saw we paid our mother's mortgage, the Court would give us title to her home."

condo or have any contact with The Castillian. He did not notify The Castillian or the appraisal district that they had paid off the Citibank mortgage.

### III. Summary Judgment

The Douglases argue that The Castillian's and Harris's traditional summary-judgment motions should not have been granted because their motions failed to conclusively negate any of the elements in the Douglases' causes of action. They complain that the trial court should not have granted The Castillian's no-evidence summary-judgment motion because they raised sufficient fact issues to defeat it.

### A. Standards of review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden

shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that no evidence supports an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which no evidence exists. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary-judgment evidence that raises a genuine, material fact issue. *See* Tex. R. Civ. P. 166a(i) & 1997 cmt.; *B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020).

When a party moves for summary judgment under both Rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of Rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant failed to produce more than a scintilla of evidence under that burden, there is no need to analyze whether the appellee's summary-judgment proof satisfied the Rule 166a(c) burden. *Ridgway*, 135 S.W.3d at 600.

## B. Wrongful foreclosure

The elements of wrongful foreclosure are (1) a defect in the foreclosure-sale proceeding; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price. *Buchanan v. Compass Bank*, No. 02-14-00034-CV, 2015 WL 222143, at *5 (Tex. App.—Fort Worth Jan. 15, 2015, pet.

10

denied) (mem. op.). The Castillian challenged the defect-in-the-foreclosure-sale element, arguing in both the no-evidence and traditional portions of its summary-judgment motion that it was not prohibited from conducting a nonjudicial foreclosure under the condominium declaration[12] and that it had strictly complied with all statutory requirements.

### 1. Nonjudicial foreclosure

The Douglases argue that The Castillian had no right to nonjudicially foreclose on the condo. The Castillian responds that its enabling declaration does not prohibit nonjudicial foreclosure and that the Texas Uniform Condominium Act (TUCA) expressly permits it. This portion of the parties' dispute centers on how to construe the declaration with TUCA.

We construe a condominium declaration under the rules of contract interpretation. *See Jakab v. Gran Villa Townhouses Homeowners Ass'n*, 149 S.W.3d 863, 867 (Tex. App.—Dallas 2004, no pet.). Contracts, like statutes, should be construed based on their plain language, *Compass Bank v. Calleja-Ahedo*, 569 S.W.3d 104, 114 (Tex. 2018), and by considering the entire writing in an effort to give effect to all the

---

[12]A declaration is the instrument that establishes property under a condominium regime. Tex. Prop. Code Ann. § 81.002(5); *see also id.* § 82.003(a)(11) (defining declaration as "an instrument, however denominated, that creates a condominium, and any amendment to that instrument"). A declaration forms a contract between the homeowners association and the condominium unit owners. *Bundren v. Holly Oaks Townhomes Ass'n*, 347 S.W.3d 421, 435 (Tex. App.—Dallas 2011, pet. denied).

provisions so that none will be rendered meaningless, *AMI Ass'n Mgmt., Inc. v. Sprecher*, No. 01-15-00791-CV, 2017 WL 3526762, at *4 (Tex. App.—Houston [1st Dist.] Aug. 17, 2017, no pet.) (mem. op.) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).

Dolores's condo was governed by a 1976 declaration that included a monthly assessment[13] for which a lien could be placed that would be inferior to a tax lien or a mortgage, vendor's lien, or deed of trust filed for record before the date payment of assessments became due. The pertinent portion states,

> Such lien for assessments . . . *may* be foreclosed, without prejudice and subject to the aforesaid prior liens, *by suit* by the Board of Administration or any authorized officer thereof, acting in behalf of the Council of Co-Owners, in like manner as mortgages on real property. No such foreclosure shall affect or impair any such prior liens. . . . Further, to

---

[13]Under the 1976 declaration, each condo owner had to pay his or her pro-rata share of various expenses

> assessed pursuant to authority given by said [Texas Condominium] Act, or this Declaration or said By-Laws, each of which assessments shall become due and payable within 21 days from the date each such assessment is made unless otherwise specified in the By-Laws, and such assessments, together with reasonable attorney's fees as hereinafter provided, shall become liens against the respective apartment units for their prorata share thereof at the time such assessments become due and payable unless otherwise specified in said By-Laws. No owner shall be exempt from contributing toward such expense, charges, costs or assessments by waiver of the use o[r] enjoyment of the common elements, either general or limited, or by abandonment of the apartment belonging to him. In the event it shall become necessary for the Council of Co-Owners or Board of Administration to employ the services of an attorney to collect said assessment and enforce the lien herein granted, the owner or owners failing to pay said assessment shall pay, in addition to the assessment due, reasonable attorney's fees to the Council of Co-Owners or Board of Administration.

collect sums owed to the Council of Co-Owners by apartment owners, the Board of Administration may deny delinquent owners the right to use the common elements and may suspend all services, including utility services, and *may exercise any other right or remedy available to enforce such claim.*

[Emphases added.] The Douglases argue that "by suit" means that nonjudicial foreclosure is prohibited. The Castillian argues that it could exercise any "other right or remedy available," including nonjudicial foreclosure.

The declaration also included the following interpretation and savings provisions:

> . . . If any declaration or provisions herein contained shall be susceptible of two or more interpretations, the interpretation which shall most nearly be in accord with the purposes and intents hereof[14] shall govern.
>
> . . . In the event of the omission herefrom of any declaration, stipulation or provision which shall be vital, necessary or expedient for the accomplishment of the purposes and intent of this Declaration, this Declaration shall not thereby fail, in whole or in part, but any and all omitted matter shall be supplied herein by inference and/or by reference to the provisions of the Texas Condominium Act under which this condominium regime is established, and such provisions of such Act are hereby made part hereof by reference thereto.

Chapter 81 of the Property Code, the Texas Condominium Act, applies to a condominium regime created before January 1, 1994.[15] Tex. Prop. Code Ann.

---

[14]The declaration's introductory paragraphs set forth the intention to submit the property "to the condominium regime established by the Texas Condominium Act, *as now existing or hereafter amended . . . .*" [Emphasis added.] As set out in the declaration and noted above, an integral part of that regime was the pro-rata payment of common expenses through the assessments.

[15]*See generally* Act of May 15, 1963, 58th Leg., R.S., ch. 191, §§ 1–26, 1963 Tex. Gen. Laws 507, 507–12 (amended 1979 and repealed and replaced in 1983 with

13

§§ 81.001, .0011. A condominium regime created before January 1, 1994, to which the Texas Condominium Act applies, "is also governed by Chapter 82 [i.e., TUCA] as provided by Section 82.002."[16] *Id.* § 81.0011(b). Accordingly, some sections of TUCA apply to the declaration at hand via Section 81.0011(b).[17] *See id.* § 82.002(c). But these

_____

Property Code's enactment) (current version at Tex. Prop. Code Ann. §§ 81.001–.210). The 1963 Act, then-Article 1301a of the Revised Civil Statutes, required a declaration to contain various descriptions of the land, individual units, and common elements, the fractional or percentage interest that each unit bore to the entire condominium regime, and "[a]ny further provisions, matters, or covenants desired" and stated that upon sale of a unit, any unpaid assessments for the unit's pro-rata share of common expenses (such as administration, maintenance and repair of general common elements) would first be paid out of the sale price except for assessments, liens, and charges in favor of the state for past-due taxes and "[a]mounts due under mortgage instruments duly recorded." *See* Tex. Rev. Civ. Stat. Ann. art. 1301a, §§ 7, 18 https://www.sll.texas.gov/library-resources/collections/historical-texas-statutes/bookreader/1964/#page/278/mode/2up (last visited Sept. 14, 2022); *see also* Tex. Prop. Code Ann. §§ 81.102(b), .208 (stating essentially same information). Neither Chapter 81 nor its predecessors specifically address foreclosure. *See Dickerson v. DeBarbieris*, 964 S.W.2d 680, 684–85 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("Although the condominium statutes in effect since 1963[] have prescribed what a condominium declaration must contain, none have required it to specify the existence of either a power of sale, a nonjudicial foreclosure remedy, or even the lien itself.").

[16]*See* Robert D. Burton, *TUCA Turns 25*, 30 State Bar of Tex. Prof. Dev. Program, Advanced Real Estate Drafting Course (2019), 2019 WL 2075567 (noting that the Texas Condominium Act "lessened hardships of the 1960s housing crisis [but] . . . was destined to be left behind, as it proved inadequate to address real world issues faced by condominiums").

[17]TUCA also applies to a condominium for which the declaration was recorded before January 1, 1994 if either the owners of units vote to amend the declaration to have Chapter 82 apply and that amendment is filed for record in the condominium records in each county where the condominium is located or the pre-1994 declaration or an amendment thereto states that Chapter 82 will apply in its entirety on January 1, 1994. Tex. Prop. Code Ann. § 82.002(a). The record here reflects no such vote or

sections "apply only with respect to events and circumstances occurring on or after January 1, 1994, and do not invalidate existing provisions of the declaration, bylaws, or plats or plans of a condominium for which the declaration was recorded before January 1, 1994."[18] *Id.*

The question here is whether Subsection (e) of Section 82.113 applies. Subsection (e) states that a condo association has the right to foreclose an assessments lien judicially *or* by nonjudicial foreclosure under the power of sale created in either Chapter 82[19] *or* the declaration, except that it may not foreclose a lien for assessments consisting solely of fines. *Id.* § 82.113(e).

---

amendment by The Castillian's unit owners. *Cf. Dickerson*, 964 S.W.2d at 682 (noting that condo association amended its bylaws in 1989 to provide that it could use nonjudicial foreclosure).

[18]Specifically, Sections 82.002, .005–.007, .053–.054, .102(a)(1)–(7), (a)(12)–(21), (f), and (g), 82.108, .111, .113–.114, .116, .118, .157, and .161 apply, as listed in Section 82.002(c), if they do not invalidate existing declaration provisions. *See* Tex. Prop. Code Ann. § 82.002(c); *Riner v. Neumann*, 353 S.W.3d 312, 317 (Tex. App.—Dallas 2011, no pet.) (refusing to apply TUCA to a pre-1994 declaration to the extent Section 82.113 contained different lien-priority provisions that would invalidate those set forth in the declaration); *see also Kenneth D. Eichner, P.C. v. Dominguez*, No. 14-16-00192-CV, 2017 WL 2561334, at *7 (Tex. App.—Houston [14th Dist.] June 13, 2017, no pet.) (mem. op.) (same).

[19]Subsection (a) states that an assessment is a unit owner's personal obligation, "secured by a continuing lien on the unit"; Subsection (b) sets out the priority of liens; and Subsection (c) states that the association's lien for assessments is created by recordation of the declaration, "which constitutes record notice and perfection of the lien," requiring no further recordation unless the declaration provides otherwise. Tex. Prop. Code Ann. § 82.113(a)–(c). Subsection (d) provides that by acquiring a unit, the unit owner grants to the association a power of sale in connection with the association's lien for assessments and that, except as provided by the declaration, an

15

The Douglases contend that the declaration allows for only judicial foreclosure, preventing the application of Section 82.113. The Castillian responds that it could conduct a nonjudicial foreclosure because the declaration did not prohibit it and Section 82.113 permitted it. The Castillian contends, "The only time condominium associations are prohibited from using nonjudicial foreclosure is when the condominium's declarations **expressly prohibit** nonjudicial foreclosures."

The declaration here states that an assessment lien "may" be foreclosed "by suit," but it does not otherwise explicitly address foreclosure. *See Aghili v. Banks*, 63 S.W.3d 812, 817 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (op. on reh'g) (noting that precatory use of "may" in condo declaration did not require additional recording of assessment lien). The declaration's plain language does, however, expressly allow the condo association to "exercise any other right or remedy available" to collect delinquent assessments, and it incorporates by reference the Texas Condominium Act, which subsequently incorporated certain portions of TUCA, including Section 82.113. *See Dickerson*, 964 S.W.2d at 684–85 (observing that, historically, the condominium statutes have not required declarations to specify a nonjudicial-foreclosure remedy); *see also Aghili*, 63 S.W.3d at 817 (overruling the appellant's complaint based on the appellant's interpretation of the declaration that

association shall exercise its power of sale pursuant to Section 51.002. *Id.* § 82.113(d). Section 51.002 sets out the requirements to sell real property under a power of sale conferred by a deed of trust or other contract lien. *Id.* § 51.002.

16

"would render meaningless the language in the second paragraph allowing enforcement of the lien by all available methods"). Accordingly, we conclude that The Castillian could use nonjudicial foreclosure here without invalidating the declaration, and we overrule this portion of the Douglases' first and second issues.

**2. Compliance with Section 51.002**

Section 51.002 requires that notice of a real-property sale under a power of sale conferred by a deed of trust or other contract lien must be given at least 21 days before the sale date by (1) posting written notice of the sale at the county courthouse door; (2) filing a copy of the posted notice in the county clerk's office; and (3) serving written notice of the sale by certified mail on each debtor. Tex. Prop. Code Ann. § 51.002(b). The sale must be a public sale at auction held between 10 a.m. and 4 p.m. of the first Tuesday of a month in the area designated by the county commissioners court. *Id.* § 51.002(a). Service of a notice under this section by certified mail is complete when the notice is deposited in the United States mail, postage prepaid and addressed to the debtor at the debtor's last known address, and the affidavit of a person knowledgeable of the facts to the effect that service was completed is prima facie evidence of service. *Id.* § 51.002(e); *see id.* § 51.0021 ("A debtor shall inform the mortgage servicer of the debt in a reasonable manner of any change of address of the debtor for purposes of providing notice to the debtor under Section 51.002.").

The Castillian demonstrated its compliance with Section 51.002's requirements by attaching to its summary-judgment motion:

- its March 18, 2015 letter, which was mailed to Dolores's post office box and other addresses, informing the Douglases of the $5,360 owed for assessments, related charges, and attorney's fees;

- its May 1, 2015 letter, which was mailed to Dolores's post office box and other addresses, informing the Douglases that it would be filing a notice of lien against the property for the amount owed;

- the August 5, 2015 notice of assessment-lien sale warning that the property would be sold on September 1, 2015, between 10 a.m. and 4 p.m. at the east steps of the Tarrant County Courthouse;

- its August 5, 2015 letter, which was mailed to Dolores's post office box and other addresses, supplying the Douglases with a copy of the notice of assessment-lien sale;

- the affidavit of its agent stating that on August 5, 2015, the notice of assessment-lien sale was deposited "into the care and custody of the [USPS], postage prepaid, certified mail, return receipt requested, properly addressed to Estate of Dolores Douglas, Charles Douglas, Jr., Heir at Law and Derek Douglas, Heir at Law at the most recent address shown by the records of the holder of the indebtedness";

- its September 11, 2015 letter, which was mailed to Dolores's post office box and other addresses, notifying the Douglases that the condo had been sold;

- Derek's and Charles's deposition testimony showing that they had never notified The Castillian or the Tarrant County Appraisal District of any change of address or contact information before the sale; and

- the September 19, 2007 amendment to The Castillian's bylaws, which was filed in the Tarrant County real-property records and which required that "[w]ithin thirty (30) days of becoming an owner, owners must notify the Association, in writing, of the mailing address. Further, owners must notify the Association, in writing, of any change in their mailing address within thirty (30) days after such change of address."

18

The Douglases argued in the trial court and argue on appeal that The Castillian should have undertaken an heirship search to give them notice,[20] and they attached Charles's affidavit, in which he stated that "[t]he office people at Castillian Condominiums had [his] phone number." But neither Section 82.113 nor Section 51.002 requires undertaking an heirship search or making phone calls. Accordingly, because the Douglases failed to raise a genuine issue of material fact regarding The Castillian's compliance with the statutory requirements, we overrule this portion of their first and second issues without reaching their grossly-inadequate-selling-price or causation arguments. *See* Tex. R. App. P. 47.1. Additionally, because the Douglases' unjust-enrichment and trespass-to-try-title claims hinge in part on their wrongful-foreclosure and notice arguments, we likewise overrule these portions of their first and second issues. And we overrule their third issue as to Harris's summary-judgment motion because its disposition also turns on their wrongful-foreclosure arguments.

## C. Theft and conversion

The Douglases sued for theft under the TTLA with an alternative theory of conversion. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001–.005. To prevail on a TTLA claim, a plaintiff must establish that he owned the property, that the defendant unlawfully appropriated the property in violation of the Penal Code, and that the

---

[20]To their summary-judgment response, the Douglases attached a portion of Reed's deposition in which he testified that no heirship search was undertaken and that he did not recall whether The Castillian had performed an independent investigation to determine where Charles and Derek lived.

plaintiff sustained damages as a result of the theft. *Morrison v. Gage*, No. 02-15-00026-CV, 2015 WL 4043260, at *4 n.7 (Tex. App.—Fort Worth July 2, 2015, no pet.) (mem. op.) (citing Tex. Civ. Prac. & Rem. Code Ann. §§ 134.002–.003, .005); *see* Tex. Penal Code Ann. § 31.03(a), (b)(1) (stating that a person commits theft if he unlawfully appropriates property with the intent to deprive the owner thereof and that appropriation is unlawful if it is without the owner's effective consent). Under the Penal Code, an "owner" is a person who has title to the property; possession of the property, whether lawful or not; or a greater right to possession of the property than the actor who appropriates it. Tex. Penal Code Ann. § 1.07(a)(35)(A).

Property that is abandoned cannot be the subject of theft. *Sharpe v. Turley*, 191 S.W.3d 362, 366 (Tex. App.—Dallas 2006, pet. denied). "Abandon" means to give up—it is a total desertion, an absolute relinquishment. *Ingram v. State*, 261 S.W.3d 749, 753–54 (Tex. App.—Tyler 2008, no pet.) (noting, in burglary case, that when an individual trespasses onto real property and takes possession of abandoned personal property, such an act is wrongful because title to the personal property "rests in the owner of the soil"). Title to abandoned personal property vests in the first person lawfully reducing it to possession. *Trenolone v. Cook Expl. Co.*, 166 S.W.3d 495, 500 (Tex. App.—Texarkana 2005, no pet.) (explaining that to ripen title to personalty, a person must reduce it to lawful possession after it has been abandoned).[21]

---

[21]The Property Code's general presumption that personal property is abandoned if, for longer than three years, the property owner's location is unknown

A conversion claim requires establishing that the plaintiff owned or had legal possession of the property or was entitled to possess it, that the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of or inconsistent with the plaintiff's rights as an owner, that the plaintiff demanded return of the property, and that the defendant refused to return the property. *Morrison*, 2015 WL 4043260, at *4 n.7; *see Fernandez v. Peters*, No. 03-09-00687-CV, 2010 WL 4137491, at *5 (Tex. App.—Austin Oct. 19, 2010, no pet.) (mem. op.) (affirming appellee's summary judgment on appellant's conversion claim when she testified in her affidavit that she acquired the real property at a foreclosure sale, that there was personal property located on it, that there was no claim or notice of claim to the personal property, and that she disposed of it); *cf. Tex. Pearl, LLC v. Koegel*, No. 03-14-00556-CV, 2015 WL 6119491, at *5 (Tex. App.— Austin Oct. 14, 2015, no pet.) (affirming judgment on conversion claim when tenant paid rent through the end of January and landlord's property manager testified that the cleaning crew "got rid of" things they found in the apartment prior to the end of January).

In the no-evidence part of its motion, The Castillian argued that the Douglases had no evidence (1) that The Castillian had taken any unlawful action, (2) that the

---

and a claim to the property has not been asserted or an act of ownership of the property has not been exercised, *see* Tex. Prop. Code Ann. § 72.101(a), does not apply here because three years did not pass between Dolores's death (May 16, 2014) and The Castillian's disposal of the property (April 28, 2017).

Douglases were owners of the property on April 28, 2017, when it was destroyed, (3) that the Douglases had demanded a return of the property, or (4) that The Castillian had refused to return the property. In the traditional part of its motion, The Castillian argued that the Douglases had no claim for statutory theft when the Castillian did not unlawfully appropriate anyone's property because it had acquired ownership and possession of the condo at the time it entered and disposed of the "abandoned personal property inside."[22] It argued that the Douglases had no claim for conversion because they had made no demand for the property's return and had failed to give any notice that they had a claim to it. The Castillian attached the affidavit of one of its board members, stating that The Castillian had received no claims or notices of any claims to the personal property in the condo before the property's removal on April 28, 2017.[23]

In their response, the Douglases argued that there was no summary-judgment evidence that they had abandoned the property.

The Castillian demonstrated that the property had been abandoned by attaching to its summary-judgment motion photographs taken on the day Junk Guru

---

[22]In its fifth amended answer, The Castillian raised the defense of abandonment. *See Cargal v. Cargal*, 750 S.W.2d 382, 384 (Tex. App.—Fort Worth 1988, no writ) (stating that abandonment is an affirmative defense that must be pleaded).

[23]Although the Douglases objected to this affidavit, the trial court overruled their objection, and the Douglases do not appeal that ruling.

hauled the property away, showing the condition of the condo and the property, as well as its ample notice of its intent to foreclose on the condo that contained the property, with no response from the Douglases during that time or after the foreclosure, when it obtained title to the condo in which the personal property had been left.[24] *See* Tex. Penal Code Ann. § 1.07(a)(35)(A) (defining "owner" to include someone who has possession of the property). And the Douglases provided no evidence that they had demanded the property or that The Castilian had refused to return the property. Accordingly, because the Douglases failed to raise a genuine issue of material fact with regard to at least one element each of their TTLA and conversion claims, the trial court did not err by granting summary judgment, and we overrule this portion of their first and second issues.

---

[24]The record reflects that The Castillian had no mailing addresses for the Douglases beyond Dolores's addresses at the time of her death and that it disposed of her personal property only after acquiring the condo at foreclosure (September 1, 2015), over a year after her death. *Cf.* Tex. Prop. Code Ann. § 92.014(c)(5) (stating that a landlord may discard a deceased tenant's property if it has mailed a written request by certified mail, return receipt requested, to a person designated by the tenant to contact in the event of the tenant's death, requesting the property's removal; the contacted person fails to remove the property within 30 days; and prior to the date of discarding the property, the landlord has not been contacted by anyone claiming the property), § 93.002(e) (stating that a landlord may remove and store any property of a commercial tenant that remains on abandoned premises and may dispose of it if the tenant does not claim it within 60 days); Tex. Code Crim. Proc. Ann. art. 18.17(a)–(b) (stating that unclaimed or abandoned personal property seized by a peace officer that remains unclaimed for 30 days shall be delivered for disposition to a designated official who is required to mail a notice to the property owner's last known address by certified mail, warning that the property will be disposed of within 90 days and where the sales proceeds will be placed).

## D. Negligence

The Douglases argue that they were tenants at sufferance to whom The Castillian owed a duty to file a forcible-detainer action, entitling them to recover for negligence.

The Castillian argued in the no-evidence portion of its summary-judgment motion that the Douglases had no evidence that it was negligent in failing to file a forcible-detainer action because the Douglases had no evidence that they were ever tenants or that there was a landlord–tenant relationship at any time. It argued in the traditional part that the Douglases could not recover for negligence for failure to file a forcible-detainer action because they were not tenants or tenants at sufferance—there were no agreements of any kind between them that could be construed as having created a landlord–tenant relationship.

The Douglases responded that the purchaser at a foreclosure sale must dispossess all occupants by using the forcible-detainer procedure and that there is no summary-judgment evidence that The Castillian demanded possession of the condo after the foreclosure sale.

A person commits a forcible entry and detainer if the person enters the real property of another without legal authority or by force and refuses to surrender possession on demand. Tex. Prop. Code Ann. § 24.001. A person who refuses to surrender possession of real property on demand commits a forcible detainer if he (1) is a tenant or subtenant willfully and without force holding over after the

24

termination of the tenant's right of possession; (2) is a tenant at will or by sufferance, including an occupant at the time a lien superior to the tenant's lease is foreclosed; or (3) is a tenant of a person who acquired possession by forcible entry. *Id.* § 24.002(a). Under Section 24.005, if the occupant is a tenant under a written lease or oral rental agreement, a tenant at will or by sufferance, or a tenant of a person who acquired possession by forcible entry, the landlord must generally give at least three days' written notice to vacate the premises before filing a forcible-detainer suit. *Id.* § 24.005(a)–(c).

Key to all these provisions is the requirement that a *tenant* be *in possession* of the real property in question because the only issue in a forcible-detainer action is which party has the superior right to immediate possession. *Jimenez v. McGeary*, 542 S.W.3d 810, 812 (Tex. App.—Fort Worth 2018, pet. denied). The Property Code defines "tenant" as "a person who is authorized by a lease to occupy a dwelling to the exclusion of others and . . . who is obligated under the lease to pay rent." Tex. Prop. Code Ann. § 92.001(6); *see also id.* § 92.001(3) (defining "lease" as "any written or oral agreement between a landlord and a tenant that establishes or modifies the terms, conditions, rules, or other provisions regarding the use and occupancy of a dwelling"); *Soto v. Pantalion*, No. 01-20-00321-CV, 2021 WL 2931363, at *5 (Tex. App.—Houston [1st Dist.] July 13, 2021, no pet.) (mem. op.) (explaining that a lease is not necessarily required to establish a landlord–tenant relationship but defining other relationships— holdover tenant at will, holdover tenant at sufferance—in terms of the occupant's

actual possession of the property); *Martin v. Brown*, No. 03-15-00492-CV, 2016 WL 4690308, at *2 (Tex. App.—Austin Aug. 25, 2016, pet. denied) (mem. op.) (explaining that, in a legal context, an "occupant" is generally the person who is actually present and living on the property).[25]

Because there is no evidence that the Douglases were ever tenants of any sort, *see* Tex. Prop. Code Ann. § 92.001(6), or that they occupied the condo at any point after Charles turned off the electricity in 2015, there is no evidence that The Castillian owed them a duty that would subject it to a negligence claim. We overrule the remainder of the Douglases' first and second issues.

## IV. Conclusion

Having overruled all of the Douglases' issues, we affirm the trial court's judgment.

---

[25]Charles testified that between May 16, 2014 and June 25, 2015, he did not occupy the condo for any amount of time other than occasionally staying overnight when he attended a Dallas Cowboys football game. He turned off the condo's electricity at some point before June 25, 2015. Between June 25, 2015, and March 3, 2017, he did not occupy the condo or stay in it overnight, and between March 3, 2017 and July 27, 2017, he did not even go by the condo. Derek testified that he lived in Cincinnati; he did not occupy the condo at any point.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: September 22, 2022